## DiMarco Estate.

430

Argued May 8, 1969.   Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Edward W. Mullinix,* with him *Dennis R. Suplee, Guy G. deFuria,* and *Schnader, Harrison, Segal & Lewis,* and *deFuria and Larkin,* for appellant.

*Garland D. Cherry,* with him *Leigh W. Bauer,* and *Kassab, Cherry, Curran & Archbold,* and *Diamond, Polsky & Bauer,* for appellee.

OPINION BY MR. JUSTICE JONES, October 9, 1969:

This is an appeal from a decree of the Orphans' Court of Delaware County which removed a coexecutor of this estate and granted leave to the decedent's widow to file a petition to take against the decedent's will even though the one year statutory period for such purpose had expired.

Pasquale DiMarco (decedent), a Delaware County resident, died June 27, 1965 survived by his widow, Anna, four daughters and a son, Robert DiMarco, the present appellant. The only property which decedent held in his own name at the time of his death consisted of shares of stock in five family-owned corporations; he owned five of the ten outstanding shares of four

corporations,[1] the balance of the shares in each corporation being owned by appellant, and 33¾ shares of the stock of another corporation to wit, Patann Corporation.[2] At the time of his death, decedent and his wife jointly owned other property.[3]

On December 31, 1962, decedent and his wife executed a joint will, the presently pertinent portions whereof are:

"5. During the lifetime of Anna DiMarco, if she survives Pasquale DiMarco, there shall be paid to her all of the net income realized from the estate of Pasquale DiMarco. In the event said income shall be insufficient to maintain her in the same comfort to which she is accustomed, there shall be paid over to her, in addition as much of the principal of said estate as may be necessary, as determined by the trustees in the exercise of their discretion.

. . . .

"7. We name Robert DiMarco, and Anna DiMarco and Pasquale DiMarco, or the survivor of them, as executors under this will. We name Robert R. DiMarco and Alexander Schamban as trustees herein.

. . . .

"8. Said trustees shall continue to operate the enterprises which form part of our estate as long as they, in their discretion, deem it essential. Robert R. DiMarco shall remain in complete and full charge of these business enterprises and exercise his sole personal dis-

---

[1] These corporations are P. DiMarco and Company, Inc., Karakung Corporation, Wynnewood Lanes, Inc. and P. DiMarco Contracting Company.

[2] Decedent's widow owned 33¾ shares and appellant owned 60 shares of *Patann*.

[3] A joint checking account and a joint savings account, the total of which was in excess of $25,000; four pieces of developed real estate; stock in other corporations which is not involved in this litigation.

cretion in the actual operation of each business as heretofore.

. . . .

"[4] (d)    Our personal property, not limited to, but including, house furnishings, jewelry, etc., is bequeathed to our children, share and share alike. Shares of stock, specifically set forth hereinafter, are not included in this provision.

"(e)    Corporate shares of stock, registered in either or both of our names, in P. DiMarco & Co., Inc., Karakung Corporation, and Wynnewood Lanes, Inc., are bequeathed to Robert R. DiMarco."[4]

Named as residuary legatee under the will is appellant.

This will was prepared by Alexander Schamban, an attorney who had been counsel for decedent and his wife. After execution, the will was delivered into the possession of decedent and his wife and, after decedent's death, remained in the widow's possession until presented for probate. On July 26, 1965, this will was probated and letters testamentary granted to the widow and appellant.

More than three years subsequent to the grant of letters testamentary and more than two years after the expiration of the one year statutory period for making an election to take against the will,[5] the widow filed a petition to take against the will and another petition to remove appellant as coexecutor of the estate. Both petitions were joined for the purpose of hearings and, after hearings before the Orphans' Court of Delaware County, that court removed appellant as coexecutor and permitted the widow to take against the will even though her petition to do so was tardily filed.

---

[4] It is to be noted that the decedent's stock in Patann and P. DiMarco Contracting are not included in 4(e).

[5] Act of April 24, 1947, P. L. 89, §11, 20 P.S. §180.11.

In its opinion, the court below, in support of its decree, rationalized its views: (1) that there was sufficient evidence of fraud to justify the late filing by the widow of her election to take against the will and (2) appellant's removal as coexecutor was justified because no inventory or account had been filed, he had failed to provide his mother, coexecutrix, with information and the existence of a conflict of interests.

The statutory provisions governing the right to elect to take against a will specifically provide that the surviving spouse's election shall be filed *within one year* after probate of the will (Act of April 24, 1947, P. L. 89, §11, 20 P.S. §180.11) and that failure to make an election within the one year time limit "shall be deemed an election to take under the will or an acquiescence in the provisions thereof. . . ." (Act of 1947, supra, §12, 20 P.S. §180.12).

In *Minnich's Estate,* 288 Pa. 354, 357, 136 A. 236 (1927), this Court stated: ". . . In the instant case the election was not made until nearly three years after the letters of administration were issued. To give effect to such belated election would be in the teeth of the statute and practically destroy it. If ten months of undue delay can be ignored here, years can in other cases, and thus render wholly uncertain what the statute intended to be certain [citing authorities]. The very object of the statute was to limit the time when the election must be filed." Quite recently, in *Faller Estate,* 407 Pa. 73, 77, 180 A. 2d 33 (1962), we said: "This time requirement is *mandatory* and cannot be extended except upon proof that the surviving spouse, *by actual fraud,* has been induced or misled to delay the election . . . ." (Emphasis supplied). See also: *Freer Estate,* 353 Pa. 351, 355, 45 A. 2d 47 (1946); *Broad's Estate,* 325 Pa. 541, 190 A. 872 (1937); *Daub's Estate,* 305 Pa. 446, 157 A. 908 (1931).

The burden of proving actual fraud which would relieve the surviving spouse from the mandatory time requirement of the statute rested upon the widow and, in support of that burden, it was her duty to prove actual fraud by evidence clear, precise and convincing in nature.

The court stated that there was "sufficient evidence of fraud" to justify the untimely election. Such fraud necessarily had to be centered around an event which allegedly took place on July 26, 1965—approximately a month after decedent's death—and shortly after the probate of the will. This event concerns a remark allegedly made in the courthouse at that time by Mr. Schamban concerning the will. On the morning of the first day of the hearing, the widow testified as follows: "Well, just me signed, that's all, and signed Register of Will, that's all, it's nothing, just Mr. Schamban said to me, 'Anything your name, all belongs to you,' That's all, and I didn't say nothing."

According to this alleged statement its literal and full import, it meant that any assets held jointly by decedent and the widow would go to the widow. However, later on in the hearing, the widow was recalled and her then version of the alleged statement by Mr. Schamban was as follows: ". . . Mr. Schamban said, 'What you going to do now, Mrs. DiMarco? It happened. You take care of yourself. *Anything in the name of Mr. DiMarco, that's yours.*'" (Emphasis supplied)

Between the time the widow first testified and her second version of the incident, one of her daughters, a Mrs. Donatoni, had testified that she was present at the time of the alleged remark and her recollection was as follows: "Well, *from what I recall,* Mr. Schamban said to my mother: 'Mrs. DiMarco, try to forget what has happened. Go down to the shore, have a nice

time.' He said, *'Everything that was in your husband's name is now yours'*—". (Emphasis added.)

In passing upon this testimony we must bear in mind that the widow, of Italian extraction, was most inarticulate in the English language. After her first testimony, the widow's counsel indicated that he would like to have an interpreter present and consent to obtain such interpreter was given by the court. However, no interpreter appeared and counsel elected to proceed to further question the widow without the assistance of an interpreter. It is further to be noted that the testimony of Mrs. Donatoni distinctly labeled the alleged statement as *her recollection* of Mr. Schamban's statement.

Four persons were present at the time of the alleged statement: the widow, Mrs. Donatoni, Attorney Schamban and appellant and both the latter denied that any such statement was made. From the testimony the court concluded that Mr. Schamban had told the widow that "everything was her's" and that, in making such a statement, fraud was committed on the widow. In evaluating the alleged statement it must be borne in mind that the will was made by decedent and his widow when both were present, that it was a joint will and that it was in the possession of the widow for almost a month subsequent to decedent's death and prior to the time of probate. We fail to find, under the clear, precise and convincing rule as to the standard of requisite proof, that this statement constituted the "actual fraud" which would give to the widow the right to file an election after expiration of the statutory period.

In *Freer*, supra, the failure of the attorney and the personal representatives of the decedent to notify the surviving spouse of decedent's death did not sustain a charge of "actual fraud": in *Boileau's Estate*, 201 Pa.

493, 51 A. 338 (1902), the fact that the surviving spouse was ignorant of the law and had no knowledge of her right to take an election did not justify an untimely filing; in *Taylor's Estate, No. 1,* 24 Pa. D. & C. 512 (1935), the failure of decedent's personal representative and counsel to inform the surviving spouse of the right to take against the will did not justify a tardy election. See also: *Flower's Estate,* 30 Pa. Dist. 967 (1921). Moreover, to justify a finding of "actual fraud" there must be proof of an intent to deceive on the part of the person or persons who misrepresented or misstated either a fact or the law. See: *Daub's Estate,* 305 Pa. 446, 157 A. 908 (1931) (where the personal representative inadvertently provided the surviving spouse with mistaken information concerning the value of an asset of the estate, such value being critical to the decision whether to take against the will); *Salomon's Estate,* 297 Pa. 299, 146 A. 891 (1929) (where a misstatement of law was admittedly made through ignorance and without any proof of intent or purpose to defraud the surviving spouse).

Our reading and rereading of the instant record fails to disclose evidence of "actual fraud", either on the part of the attorney, the accountant or the appellant, such as would permit the widow to file her election to take against the will after the expiration of the one year statutory period. We are of the view that the court below fell into error in permitting the tardy and untimely election to take against the will in the absence of evidence of "actual fraud" and its action in this respect must be reversed.

Turning to the action of the court below in the removal of appellant as a coexecutor of this estate, we start out with the fact that the decedent in his will selected *both* the widow and appellant as the persons in whom he reposed full trust and confidence for the

proper management of his estate and the fulfillment of his testamentary direction. We recently stated in *Beichner Estate,* 432 Pa. 150, 155, 156, 247 A. 2d 779 (1968) : "The removal of a personal representative *chosen by the testator* is a drastic action which should be undertaken only when the estate within the control of such personal representative is endangered. To justify the removal of a testamentary personal representative the proof of the cause for such removal must be *clear . . . ."* (Emphasis supplied).

The legislature, granting to the Orphans' Courts of the Commonwealth (now the Orphans' Court Divisions of Common Pleas Courts) the power and authority to remove an executor, specified the grounds within the framework of which the power of removal could be exercised: (1) where an executor is wasting or mismanaging the estate, is likely to become insolvent or has failed to perform any duty imposed by law; (2) has been adjudged a lunatic, habitual drunkard or weakminded person; (3) where the executor has become incompetent, a status likely to continue, by reason of illness or mental incapacity; (4) where the executor has become a nonresident of the Commonwealth without furnishing court-directed security; (5) when "for any reason the interests of the estate are likely to be jeopardized by his continuance in office." (Fiduciaries Act of 1949, Act of April 18, 1949, P. L. 512, art. III, §331, 20 P.S. §320.331.)

As we read the instant record justification for appellant's removal is bottomed on appellant's failure to file an inventory or account in a timely manner, failure to keep his coexecutrix informed during the administration of the estate and, by reason of the fact that appellant is the residuary legatee under the will, the existence of a conflict of interest between appellant's individual and representative capacities.

It is evident that some antagonism has arisen between appellant and his mother.[6] Such ill-feeling, *per se*, would not, in the absence of a showing of injury by reason thereof to the best interests of the estate, serve as a ground for appellant's removal. When decedent appointed his widow and appellant as his personal representatives he clearly reposed in them his trust and confidence. The fact that these personal representatives do not now see eye to eye (in all probability in the instant case due to outside influence) cannot justify a court in appellant's removal especially where it is not shown that such ill-feeling has resulted in any damage or injury to the estate or the beneficiaries thereof. Cf. *Hughes Est. (No. 1),* 319 Pa. 321, 179 A. 577 (1935); *Hurley's Estate,* 313 Pa. 53, 169 A. 81 (1933); *Kaier's Estate,* 264 Pa. 296, 107 A. 724 (1919); *Price's Est.,* 209 Pa. 210, 58 A. 280 (1904); *Neafie's Est.,* 199 Pa. 307, 49 A. 129 (1901); *Parsons's Est.,* 82 Pa. 465 (1876).

The court below in its opinion stated that appellant's testimony revealed "that he did nothing as a co-executor from the time of his father's death up until the day of the hearing". For this statement we find no adequate justification upon the record. Decedent's widow and appellant engaged both counsel as well as an accountant for the estate and left the handling of the estate pretty much in their hands. All decedent's debts were paid shortly after his death. Difficulties arose in obtaining what the accountant and attorney believed to be the fair value of the estate assets for tax purposes and the federal estate tax was not settled until February 21, 1968, and, shortly thereafter, the estimated Pennsylvania inheritance tax was paid.

[6] From our perusal of this record it seems highly likely that such antagonism has been engendered by decedent's daughters' dissatisfaction with the provisions made in decedent's will.

Counsel for the estate did file an inventory which was returned because it had been filed in duplicate rather than triplicate and no inventory was filed pending approval by the federal tax authorities pertaining to new valuations of the estate assets. Under the circumstances presented we find no dereliction of duty on appellant's part.

It is claimed that appellant and estate counsel failed to keep informed and/or withheld from the widow information concerning the estate and its administration. The record facts do not support this claim.

Joseph DeLuca, prior to decedent's death, had done accounting work for decedent and his wife. DeLuca was able to speak both in the English and Italian languages. Some time shortly after the will probate, at the widow's request, he spent a half hour explaining to her the provisions of the will; within two months after the will probate, again at the widow's request, he spent almost three hours explaining the will to the widow and Mrs. Donatoni, one of her daughters, and at that time advised them that from an accounting viewpoint the declaration of dividends by the corporations, the stock of which was disposed of by the will, would be unwise; on three other occasions thereafter, he again met with the widow at her request and discussed the will and administration of the estate.

When the family disagreement arose, Mr. Schamban advised appellant to retain his own counsel; appellant retained a Mr. Eichman, a Philadelphia lawyer and the widow retained a Mr. Bauer. The latter testified that he had made three requests for certain estate data, two requests being made of Mr. Schamban and one of Mr. Eichman and that he received only an incomplete copy of a federal estate tax return. At the time of the hearing, Mr. Eichman, due to illness,

was unable to testify in person but set forth his version of what took place in a letter which was admitted in evidence by agreement of counsel. In that letter Mr. Eichman said he had provided Mr. Bauer with pertinent information regarding the administration of the estate but being uncertain whether Mr. Bauer represented only the widow or her daughters as well did not submit information with regard to the internal affairs of the several corporations; Mr. Bauer was advised that the Pennsylvania inheritance tax had been paid, that the federal estate tax return had been filed, audited and a closing letter received, that an inventory had been filed but returned for a technical reason, that there had been difficulties in valuing the estate assets and that the inventory had not been refiled pending acceptance of lower figures by the federal tax authorities and that Mr. Eichman had given Mr. Bauer copies of the critical pages of the federal estate tax return. Mr. Eichman in his letter pointed out that Mr. Bauer's request for information was limited to a request for "copies of documents" and that the copy of the important pages of the federal estate tax return, the only document then in existence, complied with Mr. Bauer's request. It is to be noted that Mr. Bauer did not contradict Mr. Eichman's statement that his request was only for documents. Under such circumstances, we do not find that there is sufficient clear and convincing evidence that appellant or his counsel failed to keep the widow informed or withheld information from the widow concerning the administration of the estate. Certainly the record evidence was not of the standard requisite to the removal of a testator-chosen personal representative.

The court below relied heavily on *Rafferty Estate,* 377 Pa. 304, 105 A. 2d 147 (1954). *Rafferty* presented an entirely different situation than that herein pre-

sented. *Rafferty* dealt with the removal of an administrator rather than a testator-chosen personal representative and in *Rafferty* the administrator claimed ownership of certain life insurance policies on decedent's life and a clear conflict of interest existed.

Appellee relies also on *Davies Estate,* 146 Pa. Superior Ct. 7, 21 A. 2d 517 (1941) and *Sharpless's Estate,* 209 Pa. 69, 57 A. 1128 (1904). *Davies* dealt with the removal of an administrator rather than an executor and there was a finding that the administrator, in seeking issuance of letters, had misstated facts as to the whereabouts of decedent's widow and children, had failed to advertise the grant of letters or to comply with the local rule of court providing notice to a widow or children of the right to an exemption and had not prepared and filed within 30 days an inventory. The *Davies* decision, upholding the lower court in removing the administrator, rested upon the obvious failure to notify decedent's widow and children of any of the proceedings or to take steps to protect their interest and the failure to file the inventory was characterized by the Court "as not very important" in that case. *Sharpless* is also inapposite to the instant factual situation. The executors, whose removal was upheld, were largely indebted to the estate, were insolvent and had disposed of their business in which a considerable part of their mother's estate was invested for a consideration, the disposition of which they refused to disclose to their coexecutor and had refused to furnish a statement of the condition of the accounts between the estate and their insolvent firm at the time of their mother's death and the court below found that the personal interests of the removed executors were antagonistic to their duties as executors and that their conduct had been motivated more by their personal interests than by the interests of the estate.

A careful scrutiny of the record indicates a lack of evidence to sustain the court's removal of appellant. Since the removal of appellant cannot be justified and since the widow's resignation as executrix was predicated on appellant's removal, in all fairness, if the widow so desires, she should be reinstated. In any event, the appellant must be reinstated as personal representative and the appointment of an administrator d.b.n.c.t.a. revoked.

Decree reversed. Estate to pay costs.

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I believe that the record more than amply supports the opinion and decree of the orphans' court, and I would affirm.

The majority opinion initially concludes that it cannot find sufficient proof of "actual fraud" to allow the widow, Mrs. DiMarco, to make her election to take against the will after the expiration of the statutory period. At the outset, in my view, it is unsound to give an overly strict reading to the "actual fraud" requirement established in earlier cases. The point is that the court below found the widow had been misled, and in reliance on the misleading information, failed to make her election at the proper time. Under those facts, I do not believe it is too helpful to concern ourselves with whether the misleading behavior should or should not bear the label of "actual fraud." It is clear that the widow cannot be deprived of her statutory right to elect to take against the will under the facts of this case.

I believe the cases relied upon by the majority are inapposite. *Freer Estate,* 353 Pa. 351, 45 A. 2d 47 (1946) and *Taylor's Estate No. 1,* 24 Pa. D. & C. 512 (1935) both involve a failure to inform or notify the widow; *Boileau's Estate,* 201 Pa. 493, 51 Atl. 338

(1902) simply centers on the widow's lack of knowledge. Likewise, *Daub's Estate,* 305 Pa. 446, 157 Atl. 908 (1931) and *Salomon's Estate,* 297 Pa. 299, 146 Atl. 891 (1929), both cited by the majority to support the proposition that there was no "intent to deceive" in the case now before us, are cases where mistaken information about either facts or law was *inadvertently* given to the surviving spouse.

The contrast between these cases and the situation with which we now are dealing is obvious. Here the court below found, from explicit testimony in the record, that the widow was *given misinformation.* She was told that "everything in your husband's name is now yours", and that simply was not true. That statement was made in appellant's presence by the attorney who prepared the will for Mr. DiMarco. This attorney further testified: "I felt no obligation to tell Mrs. DiMarco that she had a right to elect to take against this will . . ., and thereby I suppose indicate some disloyalty to Mr. DiMarco that what he thought would take place after his death wouldn't take place." In light of this testimony, it could hardly be said that the misrepresentation was inadvertent.* Rather it appears that the attorney believed that it was his role to preserve the will and to insulate it from an election, and on this record, I believe that it is wholly improper for this Court to overturn the findings of the trier of fact.

The findings of the orphans' court with reference to its decision to remove appellant as coexecutor also

---

* Further reinforcing the view that the misrepresentation was not inadvertent is the fact that the widow, immediately following her husband's death, began receiving checks of $150 per week from appellant. These checks continued for about two and one-half years. When the checks stopped, the widow went to see her husband's attorney, who had written the will, and he told her it was now "up to mother [and] son" to straighten the matter out.

are fully supported by the record. These findings, in addition, show that appellant and the attorney did nothing to dispel the latter's misrepresentation to the widow that she now owned all of her husband's property, and made more serious the effect of that misrepresentation.

Although the decision to remove an executor is one that should not be made lightly, it still is a decision that lies within the discretion of the orphans' court, see *Beichner Estate,* 432 Pa. 150, 247 A. 2d 779 (1968) ; *Fraiman Estate,* 408 Pa. 442, 184 A. 2d 494 (1962), and in my view the record before us indicates that there was no abuse of discretion in this case. Testimony clearly supports the court's conclusion that the widow was not given information concerning the estate, despite her requests to appellant that he provide her with such information. Mrs. DiMarco cannot read English, and explicitly testified that she had met with her son, daughter, and the attorney who had prepared the will because "I want to know that's [what's?] my share of my husband." Nonetheless, Mrs. DiMarco testified that appellant never explained anything about the will.

Even more serious is the clear record evidence of the conflict-of-interest position in which appellant stands as coexecutor and remainderman under the will. There is uncontradicted evidence in the record that the trust for Mrs. DiMarco provided for in the will has not been established. The accountant retained by appellant testified that he had advised against the payment of dividends from the corporation. This no-dividend policy would render the trust, if created, useless as an income producing device for the widow. As the orphans' court correctly pointed out: "On the one hand, his corporate accountant advises Robert [appellant] against the payment of dividends; on the

other hand, his office as coexecutor and trustee oblige him to make the corpus of the estate as productive as possible or to convert the corpus to something that is productive. Whether justified or not, his failure to declare dividends, to convert the nonproductive corpus, and his delay in establishing the trust inure to his ultimate benefit as an owner of the business and as remainderman under the trust. No inventory or account has been filed, and he has refused to provide the coexecutor, and beneficiary, his mother, with information."

This course of conduct by appellant makes even more grievous the earlier misrepresentation made to Mrs. DiMarco that she was entitled to all her husband's property. In reality, appellant was entitled only to an income interest in a trust that appellant failed to create, and that would likely provide no income even if created as long as appellant administered its operation. In this factual situation, I do not see how the need to allow appellee to elect to take against the will, and to remove appellant as coexecutor, could be more obvious.

One final comment is necessary. A very important reason why this Court should be reluctant to overturn findings made by a trier of fact is that we, viewing a cold record, simply are not in a position to evaluate witnesses compared with the judge who is present when their testimony is given. In this case, in commenting on appellant's attempt to change an answer given when he was on the stand earlier in the trial, the court below noted that "Robert did not impress the Court with his sincerity." The importance of appellant's character and credibility cannot be underestimated in a case of this type, where fiduciary relationships are involved, where the record shows that a conflict-of-interest exists, and where there is uncontradicted evidence that

446

a misrepresentation was made to Mrs. DiMarco which severely prejudiced her rights. I do not believe that it is proper, on this record, for an appellate court to overturn the findings and decision made below, and as a result I dissent.