## Cilvik Estate.

Argued April 22, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Joseph Serling,* with him *Serling, Olexy, Cohen and Moses,* for appellant.

*Harry Hiscox,* with him *Rosenn, Jenkins & Greenwald,* for appellee.

OPINION BY MR. CHIEF JUSTICE BELL, July 2, 1970:

This appeal involves the ownership of a joint savings account opened under one of those perplexing and vexing bank signature cards. Testator left an estate of approximately $13,000, excluding this bank account of $6,750.93.

Apolinary Cilvik died testate on October 19, 1966. His will dated May 26, 1966 was probated October 27, 1966; on that same day letters testamentary were issued to his executrix, Regina Cilvik, one of the testator's daughters*

On October 23, 1966, four days after the testator's death, some members of his family met at Regina Cilvik's home with Alexander Laffey, a member of the

---

* Testator had six daughters and three sons.

bar and scrivener of testator's will. Laffey disclosed the contents of testator's will, which contained numerous devises and bequests to his children and grandchildren, and then discussed the administration of the estate. During the conference with Laffey, a passbook to a savings account at the Franklin Federal Savings and Loan Association of Wilkes-Barre was produced by Regina Cilvik, testator's executrix.

Laffey, after examining the passbook and discovering that *it was in the joint names of the testator and Matilda Van Dyke,* another of testator's daughters, questioned Mrs. Van Dyke concerning the ownership of the account. Laffey, on direct examination, testified: "Mrs. Van Dyke was seated directly across from me at the table. My first question was to Mrs. Van Dyke, 'Did you ever see this bankbook before, Mrs. Van Dyke?' She said, 'No.' I said, 'Do you know that your name is on this bankbook together with your father's?' She said, 'No.' I asked her, 'Do you concede that all of the funds that are on deposit in this bankbook are the property of your late father and will be administered in this estate?' She said, 'Yes'. I asked her then, 'Do you claim any ownership in the deposits represented in this bankbook?' She said, 'No.' I said, 'Are you willing to come to the bank at the earliest practicable moment and sign all necessary papers to withdraw the funds in this account so that they would be deposited in the estate of your late father and distributed in his estate?', and she said, 'Yes'. I then asked her, 'Would it be convenient for you to come to my office tomorrow for the purpose of making the transfer of these funds into a new account for the benefit of the estate, to be distributed in accordance with the will of the decedent?' She said, 'Yes'. 'Will nine o'clock in the morning be convenient for you to come to my office?', and she said, 'Yes'. I said, 'Very well

then, we will have an appointment for you to be in my office at nine o'clock the next morning to make the transfer'."

Mrs. Van Dyke failed to keep her nine o'clock appointment with Laffey, but did appear at his office at approximately 11 o'clock that same morning. She then advised Laffey that she had consulted private counsel and that she was not going to transfer the money in the savings account to the estate, because her father had made a gift of the funds to her.

On October 28, 1966, Mrs. Van Dyke withdrew the money on deposit in this savings account. Since the bank regulations required that all withdrawals be accompanied by a passbook, and Laffey still had the passbook in his possession, Mrs. Van Dyke signed a sworn affidavit "that the savings share account book . . . has been lost. Diligent search has been made for said document and it cannot be found."

On February 21, 1968, testator's executrix, Regina Cilvik, petitioned the Luzerne County Orphans' Court for a rule to show cause why Matilda Van Dyke should not be compelled to turn over to the estate the sum of $6,750.93 plus interest, said sum being the amount on deposit in the savings account in question at testator's death. Mrs. Van Dyke filed an answer to the petition and a hearing was held on April 24, 1968. At the hearing, Matilda Van Dyke submitted into evidence a bank signature card* which was signed by herself and the testator for the savings account in question. This card provided in relevant part:

---

* A bank signature card is a contract which creates a savings account or a checking account when signed by the creator or creators. Pursuant to the signature card, the bank then issues a savings account passbook or checks. The reason bank signature cards have created such confusion in this branch of the law is because they are drawn by the bank principally for its own benefit and protection, and are very often loosely drawn.

"Joint Account          Account No. 37801

(Either Signature)

| (1) | Cilvik | Apolinary | S. |
|---|---|---|---|
| | (Last Name) | (First Name) | (Middle Name) |
| (2) | Van Dyke | Matilda | Mrs. |
| | (Last Name) | (First Name) | (Middle Name) |

The undersigned hereby apply for a membership and for a savings account in the

Franklin Federal Savings and Loan Association of Wilkes-Barre and for the *issuance of evidence of membership in the approved form** in the joint names of the undersigned as joint tenants with the right of survivorship and not as tenants in common. Specimens of the signatures of the undersigned are shown below and the Association is hereby authorized to act without further inquiry in accordance with writings bearing any such signature and the terms of the reverse side of this card, which are incorporated herein, it being understood and agreed that *any one of the undersigned*** who shall first act shall have power to act in all matters related to the membership and any savings account in said Association held by the undersigned, whether the other person or persons named in the account be living or not. The withdrawal may be made or balance on deposit in any such account may be paid or delivered in whole or in part to *any one of the undersigned** who shall first act, and such payment or delivery or a receipt or acquittance signed by *any one of the undersigned** shall be a valid and sufficient release and discharge of said Association."

The lower Court held that the money on deposit in the bank savings account at testator's death was part of his estate. Accordingly, the Court ordered Mrs. Van Dyke to deliver this money to the executrix of the es-

---

\* Italics throughout ours, unless otherwise noted.

\*\* Italics in original.

tate of Apolinary Cilvik. The Court dismissed Mrs. Van Dyke's exceptions, and affirmed its original Decree.

Appellant contends in this appeal that the Orphans' Court erred because (1) it did not hold that the parol evidence rule was applicable to the present factual situation and barred the present claim, and (2) in the alternative, even if the aforesaid parol evidence was admissible, it was insufficient when considered with all the other evidence to overcome the prima facie evidence of a gift inter vivos established by the signed bank signature card.

In *Berdar Estate,* 404 Pa. 93, 170 A. 2d 861, the Court said (page 95) : "When a depositor creates a joint savings account with right of survivorship, and a signature card so stating is signed by both parties, a prima facie inter vivos gift to the other party and of the creation of a joint tenancy with right of survivorship is established: Furjanick Estate, [375 Pa. 484, 100 A. 2d 85] ; Lochinger v. Hanlon, 348 Pa. 29, 33 A. 2d 1."

" '. . . Although the decision in this class of case *often depends upon the exact wording of the deposit account and the signature card and the agreement, if any, accompanying it,* the law and the proof required in such cases are well settled: Sivak Estate, 409 Pa. 261, 185 A. 2d 778; Cox Estate, 405 Pa. 444, 176 A. 2d 894 . . . .' " *Brozenic Estate,* 416 Pa. 204, 207, 204 A. 2d 918.

Evidence to overcome this prima facie inter vivos gift must be clear, precise and convincing. *Slavinski Estate,* 420 Pa. 504, 218 A. 2d 125; *Brozenic Estate,* 416 Pa., supra; *Bunn Estate,* 413 Pa. 467, 198 A. 2d 518; *Fenstermaker Estate,* 413 Pa. 645, 198 A. 2d 857; *Berdar Estate,* 404 Pa., supra.

Appellant contends that oral evidence was not admissible to rebut the prima facie inter vivos gift estab-

lished by the signed bank signature card because of the parol evidence rule. We disagree.

The signature card in this case is almost identical with the card in *Berdar Estate*, 404 Pa., supra, and what this Court said in that case is equally applicable here. In *Berdar,* the bank signature card* provided:

"JOINT SAVINGS ACCOUNT Account No. S 36984
(Subject to Order of Either)

(1) BERDAR    ; MITER    ; ——————
(Surname)  (First Name)  (Middle Name)

(2) MALUTINOK; MARY    ; ——————
(Surname)  (First Name)  (Middle Name)
(above to be typed)

The undersigned hereby *apply for a savings account* in the

FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF HOMESTEAD, PA.

*in the joint names of the undersigned as joint tenants, with the right of survivorship, and not as tenants in common.* [Footnote omitted.] Specimens of the signatures of the undersigned are shown below and the Association is hereby authorized to act without further inquiry in accordance with writings bearing either such signature; it being understood and agreed that any one of the undersigned who shall first act shall have power to act in all matters related to the membership and any account in said Association held by the undersigned, whether the other person or persons named in the account be living or not. The withdrawal or redemption value of any such account or other rights relating thereto may be paid or delivered in whole or in part to any one of the undersigned, who shall first act, and such payment or delivery or a receipt or acquittance signed by any one of the under-

---

* This card appears in the record in the Court below.

signed shall be a valid and sufficient release and discharge of said Association."

This Court held that the above signature card was not a complete written agreement, and pertinently said (pages 95-96): "In the instant case, the language of the signature card and the deposit certificate fails to disclose with any clarity the depositor's intent. . . . As a matter of fact, this signature card simply and solely sets forth the creation of a joint tenancy with right of survivorship [footnote omitted] which fact, as pointed out above, does not bar the admissibility of evidence—such as introduced in the case at bar—of acts and conduct on the part of the deceased depositor which reveal, manifest or indicate the depositor's intention at the time of the creation of the account."

The sole remaining question is whether the evidence introduced on behalf of the estate was sufficient to meet the standard of clear, precise and convincing evidence required by our cases to overcome and rebut the prima facie evidence of an inter vivos gift.

It is uncontested that all of the funds when deposited and at the time of the creation of the joint savings account in question were the *sole personal property of the testator,* and that the testator had possession of the passbook at his death. While this Court held in *Bunn Estate,* 413 Pa., supra, that the above-mentioned facts *without more* were insufficient to defeat the prima facie gift established by the signed bank signature card,* the

---

* In *Bunn Estate,* 413 Pa., supra, this Court said (page 470): "It must be recalled that only one person can have actual possession of a passbook and if the regulations of the bank provide that the deposit book or passbook must be presented when a withdrawal is made, such a rule or regulation is for the convenience and protection of the bank and does not change the basic agreement of joint tenancy with right of survivorship: Cox Estate, 405 Pa., supra, and cases cited therein."

instant case is clearly distinguishable from *Bunn* because there are additional facts present here.

Regina Cilvik testified that in April 1966 her father was hospitalized. During the term of testator's hospitalization, Regina handled his monetary affairs. Testator planned to recuperate from his hospitalization in Brooklyn, New York, at the home of Anna Killian, another of his daughters. However, testator "wondered how [he was] going to handle any money he might require." Regina Cilvik assured her father that "something could be worked out." Regina phoned the Franklin Federal Savings and Loan Association of Wilkes-Barre and requested a signature card be sent to her father. *Regina asked her father to sign the bank signature card, and he complied with her request. A short time thereafter, Regina requested Matilda Van Dyke to sign the bank signature card.* In response to the following question, Regina testified: "Q. When you requested Mrs. Van Dyke to sign the signature card, what was it that you said to her? A. I said, 'You know we are going to be taking father to Brooklyn and he won't have any means of getting money there' because his intention was to come back after he was recuperated sufficiently enough, so I thought well someone should be able to get money for him if he needed it and I requested her to sign it so that she could have access to obtain money for him if he required it."

After reading the card, Mrs. Van Dyke signed it. Regina then forwarded the bank signature card to the savings and loan association. *At no time did anyone explain the legal significance of the card to the testator.* Regina merely told her father that "Tillie [Matilda Van Dyke] will be able to get money for you if you need it . . . ." The decedent did not say anything pertinent or relevant—that is, he did not say that he did or did not want Matilda to have or own the money

in the account. Indeed, it clearly appears that neither the testator nor Regina nor Matilda understood the legal significance or rights which arose because of the act of signing the bank signature card in question.

Mrs. Van Dyke in her testimony denied the testimony of Laffey and Regina, or said she did not remember any such admissions on her part; she also repeatedly stated that her father wanted and intended to give the money in this joint savings account to her. The lower Court believed the testimony of Laffey and Regina.

The appellant relies upon *Fenstermaker Estate*, 413 Pa., supra, but this reliance is unavailing. In *Fenstermaker Estate,* the Court said (pages 647-648) : "Certain well-settled principles in this area of the law must be kept in mind: (1) in the absence of fraud, accident or mistake, '[w]hen a depositor creates a joint savings . . . account with right of survivorship, and a signature card so stating is executed by both parties, these facts are prima facie evidence of a gift inter vivos by the depositor to the other, and of the creation of a joint tenancy with right of survivorship: [citing cases].': Furjanick Estate, 375 Pa. 484, 100 A. 2d 85; (2) in the absence of alleged or proven fraud, accident or mistake, if the wording of the savings account and the signature card executed in connection therewith reveals the intent of the depositor clearly and without ambiguity, parol evidence to show a contrary intent is inadmissible; if from the wording of the writings the intent of the depositor appears indefinite or uncertain or ambiguous, then parol evidence is admissible: Furjanick Estate, supra, 493; Amour Estate, 397 Pa. 262, 264, 154 A. 2d 502; (3) when a prima facie case has been made out the burden of proof shifts and to sustain such burden the evidence must be clear, precise and convincing: Rogan Estate, 404 Pa. 205, 211, 171 A. 2d 177."

We have made a careful study of the record, and from such study we are convinced that the Orphans' Court was unquestionably correct in holding that the testator did not intend to make an inter vivos gift of this savings account to his daughter Matilda.

Decree affirmed; appellant to pay costs.

Mr. Justice POMEROY concurs in the result.