389 A.2d 1053

**In re ESTATE of Margaret E. LUX, Deceased.**

**Appeal of June Alice MAHOLAGE, Executrix of the Estate of Margaret E. Lux, and June Alice Maholage, Individually.**

Supreme Court of Pennsylvania.

July 14, 1978.

Norman M. Bartko, Duquesne, for June Alice Maholage.

Ronald M. Buick, McKeesport, for June Alice Maholage, individually.

Jeffrey J. Leech, Pittsburgh, for Marilyn Gannon.

Morris M. Berger, Berger, Kapetan & Malakof, Pittsburgh, for Gertrude M. Lux.

C. W. Berger, Pittsburgh, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and LARSEN, JJ.

OPINION OF THE COURT

EAGEN, Chief Justice.

Margaret E. Lux died on December 7, 1975. On December 20, 1975, a holographic will dated July 12, 1975, was admitted to probate at the instance of June Alice Maholage (appellant), a daughter of the decedent. The will, after providing for debts and funeral expenses, directed that the remainder of the estate be divided equally among the decedent's three daughters, June Alice Maholage, Marilyn Margaret Gannon, and Gertrude Lux, and named June Alice Maholage executrix. Letters testamentary were issued to June Alice Maholage as executrix.

On March 4, 1976, the executrix filed an inventory listing estate assets in the amount of $27,734.93. Subsequently, on April 20, 1976, Marilyn Gannon and Gertrude Lux (appellees) filed a petition in the Orphans' Court Division of the Court of Common Pleas of Allegheny County seeking the removal of the executrix. The petition alleged inter alia that "wasteful mismanagement" by the executrix was jeopardizing the interests of the estate; that the executrix had failed to report all known assets of the estate, specifically at least $1306 in cash removed from the decedent's residence shortly after her death; that the executrix's personal interests were in conflict with that of the estate in that she claimed she was the sole owner of a savings account which had been in the joint names of herself and the decedent and which petitioners contended was part of the estate; and that the "actions and inactions of the executrix [had] generated unfriendly and antagonistic feelings between herself and petitioners." The executrix filed an answer disputing these allegations and raising as new matter the allegation that Marilyn Gannon and Gertrude Lux had conspired to fraudulently destroy a more recent will of the decedent which did not include Gertrude Lux as a beneficiary.

After an evidentiary hearing on this petition but before a decision was rendered, the petitioners sought and received permission to amend their petition to one seeking, in addi-

tion to removal of the executrix, that she file an account including as estate assets $1306 in cash, additional personalty including a fur coat, and the funds formerly contained in the disputed joint account, and that "petitioners' reasonable attorney's fees be paid from the assets of the estate." On August 17, 1976, the court entered a decree denying the petition for removal of the executrix but requiring her to file a supplemental inventory including $1306 in cash and other personalty as well as $10,508.95, the proceeds of the disputed joint account; the request by the executrix for probate of the alleged later will was denied.[1] Both sides filed exceptions to this decree, but all parties stipulated that the adjudication of these exceptions should be deferred until audit of the account.

On October 1, 1976, the executrix filed her first and final account, which included a supplemental inventory filed "subject to the preservation of exception rights." Both sides filed objections to the account. After a further evidentiary hearing, the court on January 3, 1977, entered a decree of distribution which required the executrix to include interest on both the cash and the joint account, to have appraised and to include in another supplemental inventory certain watches and jewelry omitted from the account; and to change the inventory value of a cast iron bank from $1 to $125; this decree also awarded $1500 in counsel fees to the attorney for Marilyn Gannon and Gertrude Lux. When Mrs. Maholage filed two sets of exceptions to that decree, one as executrix and one in her own person, the court in a January 19, 1977, decree removed her as executrix. Exceptions to both the January 3 and the January 19 decrees were dismissed by the court en banc on April 12, 1977. From this final decree Mrs. Maholage here appeals both in her own person and in her capacity as executrix.[2] Personally appel-

---

1. The court also refused to surcharge the executrix for failure to pay the Pennsylvania Transfer Inheritance Tax at discount.

2. The court in its January 19 decree of removal stated: "The Register of Wills is directed to issue letters of administration, c. t. a., to a proper person, on application being made." Apparently, however, no representative has been appointed to succeed Mrs. Maholage.

lant argues the court erred in decreeing that the proceeds of the joint bank account belonged to the estate; as executrix she argues the court erred in decreeing that she be removed as executrix, that the attorney for her sisters be awarded counsel fees from the estate, and that she be required to account for $1306 in cash.[3]

## I. THE DISPUTED CASH

As to this issue, Gertrude Lux, who resided with the decedent, testified that her mother customarily kept large amounts of cash in her apartment. She testified that on the evening of her mother's death her sister June and June's husband and brother-in-law, Joe and Frank Maholage, arrived at the apartment and removed the decedent's cash and jewelry from her bedroom, that the men counted out the cash at the kitchen table, that Frank told Gertrude the cash and jewelry should be removed from the apartment for safekeeping, that he wrote out and gave her a receipt for $1306, and that the Maholages took the cash and jewelry away with them. She further testified that June later advised her not to report this cash to her welfare caseworker but that she did so, and that June also suggested to her that by not listing the cash on the inventory they could avoid paying inheritance tax on it. Marilyn Gannon testified that June was equivocal to her about the existence of this money but asked her whether, if it did exist, Marilyn would object to giving it to their nieces.

The alleged handwritten receipt was also admitted into evidence. It stated: $1306, cash—Frank Maholage—12–7–75—Gertrude Lux." Frank Maholage testified that the writing in question was his, but he stated he was on medication that evening and had no recollection of writing it. He denied seeing any paper money on the evening in question and stated that he did not presently have any such money and did not know who had it. Appellant testified that she saw no such money in her mother's apartment, but

3. The court's conclusion that there was insufficient evidence of a later will is not disputed in this appeal.

she acknowledged on cross-examination that her recollection of that evening was vague. Her position on appeal is that the money in question does not exist, and that she should not be required to supply an equivalent amount to balance her account.[4]

Undoubtedly, the burden was on appellees to prove that the money existed and was in the possession of the decedent at the time of her death—see *Whitenight v. Whitenight*, 444 Pa. 32, 278 A.2d 912 (1971)—and that appellant's actions or inactions with respect to these assets were such as to subject her to surcharge for breach of her fiduciary duty—see *Estate of Stephenson*, 469 Pa. 128, 364 A.2d 1301 (1976); *Denlinger Estate*, 449 Pa. 393, 297 A.2d 478 (1972). Appellees presented evidence tending to show that appellant knew of the existence of this money and was present when it was removed from her mother's apartment by her husband's brother, but that she had failed to disclose its existence or to take steps to make it available to the estate. The court found that the money had been received by appellant's brother-in-law and concluded that it was her duty to recover it for the estate.

Our standard of review with respect to the court's factual findings is clear: "The credibility of the witnesses and the weight to be given their testimony is in the first instance to be determined by the auditing judge. His findings of fact, affirmed by the court en banc, like those of a jury, are conclusive unless they are unsupportable by the record." *Gelb Estate*, 425 Pa. 117, 228 A.2d 367 (1967). Instantly, the court's factual findings with regard to the money are adequately supported by the record and will not be disturbed here. Appellant contends, however, that the court nonetheless erred in requiring her to list the $1306 on a supplemental inventory. She maintains, without citing any authority for her position, that the court should merely have directed her to issue a citation to Frank Maholage to

4. She does not here dispute the court's requiring her to include in a supplemental inventory the jewelry which she had not included in her account.

show cause why the fund should not be returned to the estate.

■ In recently discussing the potential liability of an executor for losses incurred by an estate because of the executor's failure to collect monies due the estate, we observed:

> "This Court has continuously held that 'The measure of diligence and care required of a trustee [or an executor] is precisely that which a man of ordinary prudence would practice in the care of his own estate . . .. A reasonable degree of vigilance and the exercise of good faith is the standard of the trustee's duty.' *Fahnestock's Appeal*, 104 Pa. 46, 52 (1883). Our cases make it clear that surcharge is the penalty imposed by the court for the failure of a fiduciary to meet his duty of care owed his estate. As we noted in *Miller's Estate*, 345 Pa. 91, 95, 26 A.2d 320, 321 (1942), 'Surcharge is the penalty for failure to exercise common prudence, common skill and common caution in the performance of the fiduciary's duty and is imposed to compensate beneficiaries for loss caused by the fiduciary's want of due care.' "

*Estate of Stephenson*, supra, 469 Pa. at 138, 364 A.2d at 1306. In the circumstances of the instant case, we find no error in the court in effect surcharging appellant for her failure to attempt to recover for the estate money found to have been removed from her mother's apartment by her brother-in-law.[5] Compare *Webb's Estate*, 165 Pa. 330, 30 A. 827 (1895); *Milligan's Appeal*, 97 Pa. 525 (1881).

## II. THE BANK ACCOUNT

It was not disputed that the decedent created the account in question exclusively with her own funds on January 10, 1975, at the West Miflin branch of Equibank, that she retained exclusive control of the passbook until her death,

---

5. The court stated in its opinion: "Frank Maholage is the brother-in-law of executrix. Her husband is Joseph Maholage, Frank's brother. The money should be returned without further proceedings. In any event, the executrix is responsible for assets of the decedent and it is her duty to see to it that this fund is returned to the estate."

and that appellant neither deposited into nor withdrew money from the account. Appellant, however, introduced into evidence the bank's signature card bearing the notation "joint account," the date "1–10–75," and the signatures of the decedent and appellant. The language of the card, addressed to the bank, stated in pertinent part:

"The undersigned, joint depositors, hereby agree each with the other and with you that all sums now on deposit or heretofore or hereafter deposited by either or both of said joint depositors with you to their credit as such joint depositors with all accumulations thereon, are and shall be owned by them jointly, with right of survivorship and be subject to the check or receipt of either of them or the survivor of them and payment to or on the check of either or the survivor shall be valid and discharge you from liability."

▮ The signed signature card was clearly sufficient to establish prima facie an inter vivos gift from the decedent to appellant. *Scott Estate,* 455 Pa. 429, 316 A.2d 883 (1974); *Dzierski Estate,* 449 Pa. 285, 296 A.2d 716 (1972). This shifted the burden to appellees to establish by clear, precise, and convincing evidence that, when she created the account, the decedent did not intend to give appellant a joint tenancy with right of survivorship.[6] *Beniger Estate,* 449 Pa. 373, 296 A.2d 773 (1972); *Cilvik Estate,* 439 Pa. 522, 267 A.2d 836 (1970). The court concluded that the evidence established the decedent did not intend to make a gift to appellant but merely to create a convenience account which would enable someone to pay her bills should she become incapacitated, and that the case was therefore analogous to *Cilvik Estate,* supra. Our task on appeal is to determine whether the evidence presented was sufficiently clear, precise, and convincing to rebut the presumption of a gift inter vivos raised by the signed signature card purporting to create a joint

6. Compare 20 Pa. C.S.A. § 6304 (Supp.1977–78), effective September 1, 1976 (requiring "clear and convincing evidence of a different intent"). We note that appellees did not attempt to prove a confidential relationship between appellant and the decedent. Compare *Scott Estate,* supra; *Dzierski Estate,* supra.

account with right of survivorship.[7] See *Girsh Trust,* 410 Pa. 455, 467, 189 A.2d 852, 857 (1963).

▮ Initially, we observe that, without more, the facts that all of the money in the account was supplied by the decedent and that she at all times retained possession of the passbook are clearly insufficient to overcome the presumption of an inter vivos gift. *Cox Estate,* 405 Pa. 444, 176 A.2d 894 (1962). Further, although several witnesses testified that when the passbook was discovered in the decedent's safe deposit box after her death, appellant seemed surprised that her name was on the account and indicated she was unaware of it, we are not persuaded, particularly in view of appellant's undisputed signature on the bank card, that evidence of appellant's reaction on this occasion clearly and convincingly rebutted the prima facie evidence that a gift had been made.[8] It is clear, rather, that the court's determination the account was one of convenience depended mainly upon the testimony of Gertrude Lux.[9]

Gertrude Lux testified that her mother originally established the joint account in 1973 at the Union National Bank of Murraysville on the same day she entered the hospital to be treated for phlebitis, that the purpose of the joint account was to enable someone to get her cash in case she needed it when hospitalized and that her mother stressed this to her "many times," that June's name was put on the account because she had a car and regularly took their mother to the bank, and that the account was transferred to the West Miflin branch of Equibank after the mother moved to West Miflin. Gertrude's testimony, however, clearly indicates that she had no direct knowledge of the creation of either

7. Appellees have not disputed the validity of appellant's signature on the card.

8. An employee of the bank who testified that appellant said she was unaware her name was on the account also testified she appeared to be "going through a traumatic experience" at that time.

9. No issue of the competency of this testimony has been presented for our review. Compare *Estate of McFetridge,* 472 Pa. 546, 372 A.2d 823 (1977); *Dzierski Estate,* supra; *Donsavage Estate,* 420 Pa. 587, 218 A.2d 112 (1966).

account and that she was not privy to her mother's plans or intentions at the time either account was created; she testified that she only became aware of the existence of a joint account by "snooping around" among her mother's papers and that she "didn't even know it was happening" when the Equibank account was established. Assuming the court found credible her testimony that her mother stressed to her many times the account was one of convenience, we observe that this testimony was nevertheless lacking in specificity as to precisely when and in what circumstances these statements by the mother came to be made. Where the standard of proof required to overcome the presumption of an inter vivos gift raised by the signed bank card is one of clear, precise, and convincing evidence, we are of the opinion that such statements are in themselves entitled to little or no weight in determining the transferor's intent at the time the account was created.[10] See *Estate of Keeney,* 465 Pa. 45, 348 A.2d 108 (1975). Furthermore, Gertrude's testimony was also inconsistent in that at one point she indicated the purpose of the account was to provide for possible hospitalization expenses, but at another point she testified her mother kept large amounts of cash in the house "in case she needed cash for hospitalization."[11]

In contrast, the evidence that the account was one of convenience in *Cilvik,* supra, included detailed and direct testimony by one of the testator's daughters as to how the account in question came to be set up for him by his

**10.** Gertrude's testimony does suggest that she discussed the joint account with her mother after she discovered a statement from the Union National Bank of Murraysville relating to the original account while preparing her mother's tax returns. There was no clear indication whether this was before or after the creation of the Equibank account.

**11.** The record indicates that only one withdrawal, in the amount of $1,000, was ever made from the account. There was no evidence this money was used for medical expenses. There was evidence that the income earned by this account was credited to the decedent's checking account, which, according to the inventory, amounted to $6,099.11 at the time of death. Appellees throughout have contended not that the joint account was actually used to meet medical expenses, but that it was created in anticipation of such expenses.

daughters at his request to make his money available to him while he was recuperating out of state from an operation; [12] this Court there also strongly emphasized evidence tending to show that neither the testator nor his daughters understood the legal significance of the bank signature card in question.[13] Instantly, we conclude that the evidence was insufficiently clear, precise, and convincing to overcome the presumption of an inter vivos gift to appellant, and that the court erred in directing her to include the proceeds of the account in her inventory. Compare *LaRocca Trust,* 411 Pa. 633, 192 A.2d 409 (1963).[14]

## III.  REMOVAL OF THE EXECUTRIX

The Orphans' Court division of the Court of Common Pleas is given by statute "exclusive power to remove a personal representative when he," inter alia, "is wasting or mismanaging the estate" or "when, for any other reason, the interests of the estate are likely to be jeopardized by his continuance in office." 20 Pa. C.S.A. § 3182. In *Quinlan Estate,* 441 Pa. 266, 268–69, 273 A.2d 340, 341–42 (1971), this Court had occasion to summarize the standards applicable to a review of the exercise of this statutory power:

12.  This Court was not called upon in *Cilvik* to determine the competency of the daughter's testimony either. See n.9, supra.

13.  There was no specific evidence presented instantly as to the testator's understanding or lack thereof of the legal significance of the signature card when she created the account. The fact that she possessed at her death, in addition to the disputed savings account, a checking account, four $5,000 savings certificates, and savings accounts in trust for her grandchildren, suggests some familiarity with banking practices on her part, however.

14.  In *LaRocca Trust,* supra, 411 Pa. at 640, 192 A.2d at 413, quoting from *Broida v. Travelers Insurance Co.,* 316 Pa. 444, 448, 175 A. 492, 494 (1934), we indicated that for evidence to be found clear, precise, and convincing " 'the witnesses must be found to be credible, . . . the facts to which they testify . . . distinctly remembered and the details thereof narrated exactly and in due order, and . . . their testimony . . . so clear, direct, weighty and convincing as to enable the [factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.' " Accord, *Estate of Fickert,* 461 Pa. 653, 658, 337 A.2d 592, 594 (1975).

"The nature of our task in reviewing these situations was set out in *Beichner Estate,* 432 Pa. 150, 247 A.2d 779 (1968); 'While, under that statutory provision, [Section 331 [15]] orphans' courts do have the power of removal of personal representatives and such removal lies largely within the discretion of such courts, an abuse of such discretion renders its exercise subject to appellate review. . . . Our present inquiry is whether the court below abused its discretion . . ..' Id. 432 Pa. at 156, 247 A.2d at 782 (citation omitted).

"In our review we are mindful of well settled principles in this area. An executor, of course, is chosen by the testator himself, and his appointment 'represents an expression of trust and confidence' by the testator. *Beichner Estate,* supra, 432 Pa. at 155, 247 A.2d at 781. Hence, his removal 'is a drastic action which should be undertaken only when the estate within the control of such personal representative is endangered. To justify the removal of a testamentary personal representative the proof of the cause for such removal must be clear.' Id. 432 Pa. at 156, 247 A.2d at 782. Accord *DiMarco Estate,* 435 Pa. 428, 437, 257 A.2d 849, 853 (1969); *Fraiman Estate,* 408 Pa. 442, 449, 184 A.2d 494, 497 (1962) (citing cases); *Parsons' Estate,* 82 Pa. 465, 467 (1876)."

As noted previously, the court initially declined to remove appellant as executrix. At that time it stated:

"Although we have found reasons for criticism of the executrix, we will not now remove her from office. The estate may be concluded by her very promptly. If we were to remove her, it would be necessary to direct her to file an account. She must take this action now. The account will thereafter be audited and distribution ordered. To require a new executor to qualify and to administer the estate would cause delay and additional expense. Therefore the prayer for removal will be denied."

---

**15.** The statutory language contained in section 331 of the Fiduciaries Act of 1949, P.L. 512, Art. III, 20 P.S. § 320.331, has been retained intact in 20 Pa. C.S.A. § 3182, applicable instantly.

The court thus indicated that, although in its view grounds for removal existed, it would refrain from removing her in the expectation that the estate would be concluded expeditiously and in accordance with its directives. Subsequently, after hearing further testimony from which it concluded that appellant had failed to include in her inventory various items of jewelry which were personal assets of the decedent, despite its order to include such assets, and after she filed exceptions to the decree of distribution indicating that she continued to assert personal interests in conflict with that of the estate, the court exercised its power of removal. Although it clearly was the filing of two sets of exceptions, one in a personal capacity and one in her capacity of executrix, that prompted the court to exercise this discretionary power of removal, the court had also previously stated, in reducing her compensation as executrix, that "her own position has been so hostile to the estate that compensation over and above that sum [$1,000] would be totally unjustified."

In *Rafferty Estate,* 377 Pa. 304, 306, 105 A.2d 147, 148 (1954) this Court held: "The personal interest of a fiduciary being in conflict with that of the estate and the unfriendly feeling between the heirs constitute sufficient cause for removal." In *DiMarco Estate,* 435 Pa. 428, 257 A.2d 849 (1969) we distinguished *Rafferty* partly on the ground that the personal representative removed therein was an administrator rather than an executor chosen by the testator, but our decision in *DiMarco* turned ultimately upon the conclusion that "ill-feeling, *per se,* would not, in the absence of a showing of injury by reason thereof to the best interests of the estate, serve as a ground for appellant's removal." [Emphasis in original.] 435 Pa. at 438, 257 A.2d at 854. As we went on to observe in *DiMarco: "Rafferty* dealt with the removal of an administrator rather than a testator-chosen personal representative *and* in *Rafferty* the administrator claimed ownership of certain life insurance policies on decedent's life and *a clear conflict of interest existed."* [Emphasis added.] 435 Pa. at 441, 257 A.2d at

855. Since the record instantly demonstrates clear conflicts of interest between appellant and the estate, not only in regard to the disputed bank account which we have here concluded is not an asset of the estate but in regard to the disputed cash and other personal assets of the estate,[16] as well as, for whatever reasons, manifest hostility between appellant and the other heirs, we conclude that *Rafferty* governs this case.

Appellant nevertheless contends that, when her removal was decreed, there was insufficient evidence the interests of the estate would be endangered by her continuance in office; she maintains that since the disputed assets were then known and had been inventoried she would simply have complied with the ultimate judicial determination with regard to them. We observe that this argument is somewhat inconsistent with her argument that the disputed cash does not exist and that she has no means of supplying it. Particularly in view of her repeated and continued failure to take steps to recover the money found to have been removed from her mother's apartment, her demonstrated reluctance to include personal assets of the decedent such as jewelry in her inventory despite orders of the court to do so, and her general proprietary attitude toward the decedent's property, we cannot conclude the court abused its discretion in determining that "the interests of the estate are likely to be jeopardized by [her] continuance in office." 20 Pa. C.S.A. § 3182. Compare *Purman's Estate,* 334 Pa. 238, 5 A.2d 906 (1939), wherein we held that the court did not abuse its discretion in refusing to remove a bank as executor though the bank asserted a claim against the estate; in that case there was no showing of prejudice to the estate or hostility between the executor and the heirs, and we noted that no objection was made to the bank's serving as executor until

16. In its opinion written after the first hearing, the court noted appellant's testimony to the effect that she believed she had "the authority to distribute decedent's property as she sees fit." Compare *Rohrbaugh Estate,* 3 Fid.Rep. 225 (O. C. Cumberland, 1953).

after it had administered the estate and filed its first and final account.[17]

## IV.  THE DISPUTED COUNSEL FEES

█ The court did not detail its reasons for awarding appellees' attorney $1500 out of the funds of the estate.[18] Nevertheless, certain principles are well settled:

"It is only in very exceptional cases that an exceptant to the account of an executor, administrator or trustee in the Orphans' Court will be allowed counsel fees out of the fund. The rule in such cases is that the exceptant must pay his own counsel fee.

"Where the fund is in the hands of the court and in no jeopardy, except from the possible mistake of the court in dealing with it, and an exceptant is merely protecting his own interest, he will not be allowed counsel fees, although through his efforts others may also be benefited. *Harrison's Estate*, 221 Pa. 508, 70 A. 827; *Peoples-Pbgh. Tr. Co. v. Pbgh. U. Corp.*, 334 Pa. 107, 114, 5 A.2d 890."

*Sowers Estate*, 383 Pa. 566, 572–73, 119 A.2d 60, 64 (1956). Instantly, however, the efforts of appellees' counsel were responsible for the executrix being required to include in her inventory the proceeds of the joint account, the $1306 in cash, and other valuable assets not in the hands of the court; the court therefore must have concluded that this was an exceptional case in which counsel, having substantially bene-

---

17. Appellant also contends that the court abused its discretion in removing her because the record suggests no one could qualify to serve as her successor. We find this contention wholly without merit. See *Schultz Estate*, 392 Pa. 117, 139 A.2d 560 (1958).

18. As we observed in *LaRocca Estate*, 431 Pa. 542, 548, 246 A.2d 337, 340 (1968): "It would have been helpful if he had given in greater detail (in his adjudication or Opinion) the factors he took into consideration in fixing the amount of the fee and his reasons in support thereof." Instantly, the court also awarded appellant's counsel $2000 and stated:

"Both attorneys have spent far more time than they are, by this decision, being compensated for. We find, however, that the only equitable manner in which to determine the case is to require that the respective clients of the two attorneys pay the balances due on their fees."

fited the estate by increasing the assets available to it, was entitled to be compensated for his efforts out of the fund. See *Wilbur's Estate,* 334 Pa. 45, 73–74, 5 A.2d 325 (1939).

We cannot agree with appellant that this was purely adversary litigation and that, though a beneficiary of the estate equally with her sisters, she cannot be required to contribute to the fee of her sisters' attorney for his efforts on behalf of the estate. Compare *Ogden Estate,* 69 Pa.D. & C.2d 627 (Delaware, 1974), aff'd 467 Pa. 259, 356 A.2d 361 (1976). Nevertheless, we conclude this matter must be remanded for reconsideration in light of the fact that the greater part of the fund which the court deemed counsel had obtained for the estate, the proceeds of the bank account, has now been determined by this Court not to belong to the estate. See *Estate of Cohen,* 469 Pa. 29, 364 A.2d 888 (1976). Since the efforts of counsel did nonetheless produce some benefit to the estate, it should be within the discretion of the court below to determine whether the benefit can be said to be substantial and, if so, what the appropriate compensation should be. See *LaRocca Estate,* 431 Pa. 542, 246 A.2d 337 (1968).

Decree affirmed in part, vacated in part, and record remanded for further proceedings consistent with this opinion. Costs on the estate.