594 A.2d 322

In re FRANCIS EDWARD McGILLICK FOUNDATION.

Appeal of ROMAN CATHOLIC DIOCESE
OF PITTSBURGH, Pennsylvania

Robert Barozzini, Trustee

All Other Trustees.

In re FRANCIS EDWARD McGILLICK FOUNDATION.

Appeal of Patrick CORBETT, Francis Corbett, Louis
Anania and Robert Barozzini, the Trustees of the
Francis Edward McGillick Foundation,

Roman Catholic Diocese of Pittsburgh.

Superior Court of Pennsylvania.

Argued June 4, 1991.

Filed July 5, 1991.

254

Ralph H. German, Pittsburgh, for appellant (at 1561) and for participating party (at 1695).

Vincent J. Grogan, Pittsburgh, for Robert Barozzini, appellant (at 1695) and for participating party (at 1561).

Russell J. Ober, Jr., Pittsburgh, for all other trustees, appellants (at 1695) and for participating parties (at 1561).

Before OLSZEWSKI, HUDOCK and HOFFMAN, JJ.

OLSZEWSKI, Judge:

These are cross appeals from an order dismissing the exceptions filed by the Roman Catholic Diocese of Pittsburgh (Diocese) as well as the exceptions filed by the respondent Trustees. Diocese petitioned the Orphans' Court of Allegheny County for the removal of Patrick Corbett, Francis Corbett, Louis Anania and Robert Barozzini (hereinafter collectively "Trustees") as trustees administering the Francis Edward McGillick Foundation (Foundation). Diocese's petition further requested that Trustees be surcharged to allow the Foundation to recover excessive fees which Trustees were alleged to have received. Following a six-week hearing, the Orphans' Court, Judge Nathan Schwartz presiding, entered a decree removing P. Corbett, F. Corbett, L. Anania and R. Barozzini as trustees, ordering the filing of an accounting within 90 days, and denying the

request for the surcharge. Timely exceptions were filed and denied by the court sitting en banc. This timely appeal followed.

On appeal, Diocese contends that the trial court erroneously denied the request for a surcharge because the Foundation's net worth had increased under the stewardship of Trustees; further, that the evidence presented established the receipt of excessive fees and compensation by Trustees, justifying imposition of a surcharge in this case. Diocese's final argument is that the trial court erred in allowing Trustees to retain an advance for legal fees to defend this action when Trustees are being removed for cause.

In their cross-appeal, Trustees challenge the sufficiency of the evidence relied upon to justify their removal. Trustees also claim that Diocese lacks standing to maintain this action and cannot bring this petition in its own name because Diocese is an unincorporated association. Further, Trustees contend that the equitable doctrine of unclean hands should be applied to prevent relief in this action, and that laches applies, requiring dismissal of this petition or, at minimum, a limitation of the inquiry to the period provided for in an analogous statute of limitations. Finally, Trustees claim that they are entitled to a total reimbursement of the legal fees and costs in this proceeding as the request for a surcharge was denied, and that they are entitled to compensation for the services rendered to the Foundation during the pendency of this action.

After a close examination of the contentions of the parties, we find merit to one argument set forth by each appellant. Diocese is correct that Trustees are not entitled to retain the funds advanced by the Foundation for legal fees and costs. Trustees are correct that they may be entitled to reasonable compensation for their services to the Foundation during the pendency of these proceedings. Therefore, we affirm in part and vacate in part, and remand for the trial court to determine the amount of compensation, if any, due Trustees.

The facts of this case may be summarized as follows: The Foundation was created by Francis E. McGillick and funded by his Last Will and Testament of May 26, 1936. (Reproduced Record [R.R.] at 1224–34a.) The will creates three funds. A priesthood fund was created by a gift of $25,000.00 to the Foundation which was to invest the money and render the income therefrom each year to Diocese to be used to educate poor men and boys for the priesthood. (R.R. at 1231a.) A sisterhood fund was created by a similar gift of $25,000.00 with the income to be used in the same manner to educate women to become nuns. (R.R. at 1231a.) The remainder of the property given the Foundation was to be used for the scholarship fund; one-half of the income from this property was to be rendered to Diocese to be distributed to worthy Catholics of both sexes between the ages of 16 and 40 for educational purposes. (R.R. at 1232–33a.) The Bishop and Advisory Board of Diocese were to select the recipients. (*Id.*) Payments under the scholarship fund were to cease when the Trustees determined that there were adequate funds to establish a vocational school in the Diocese of Pittsburgh. (R.R. at 1233a.) The Bishop and his Advisory Board were to aid in the establishment of the school. (*Id.*)

The property given to the Foundation consisted of all the shares in the F.E. McGillick Co.; this company in turn owned various subsidiaries which controlled commercial and residential real estate throughout the Southwestern Pennsylvania area. (R.R. at 1224a, 1236a.) The total value of the assets was $873,373.00 as of June 30, 1969. (1969 Petition for distribution.)

During the period in question, 1980–1986, Trustees controlled the Foundation. Each Trustee received an annual salary of $9,600.00. (R.R. at 357a.) Additionally, Barozzini received compensation as the attorney and real estate manager for the Foundation as well as for the McGillick Co. and its subsidiaries. (R.R. at 1284a.) Anania received additional compensation as the accountant for the Foundation, McGillick Co. and its subsidiaries. (*Id.*)

P. Corbett and F. Corbett did not take an active role as trustees, they attended meetings and made occasional phone calls, but were not involved in any decision making. (R.R. at 351–419a, 802–843a.) Additionally, F. Corbett rented property from the Foundation's subsidiary at a rate which he determined. (R.R. at 842–43a.) Anania, despite being a trustee since January, 1982, never read the documents creating the trust until the present litigation began. (R.R. at 570a.) Although the trust documents require the filing of an annual accounting with the Orphans' Court, Anania never prepared such an accounting in his tenure as accountant for the Foundation, nor has any such accounting ever been filed. (R.R. at 424a.) In substance, the Corbetts and Anania abdicated their responsibilities as trustees in favor of Barozzini, "who has had complete control in running the Foundation." (Trial court opinion at 16, 17, 19.)

Barozzini certainly made good use of this complete control. Legal fees in the amount of $114,977.00 were charged to the Foundation from 1980–1986; however, no time records for the legal work were kept until 1984. (Trial court opinion at 20.) The real estate management fees collected by Barozzini were outlined by the trial court as follows:

[I]n 1980, he was compensated "at the rate of 5% commission on the rents collected, plus 10% supervision charge on the service type work that I supervised and arranged for at the various locations" (T. at 664). In 1982, the commission on the rental collection was raised from five percent (5%) to six percent (6%) but the supervision charge remained the same (T. at 665). In 1984 and 1985, in lieu of other compensation, he received a flat salary of Two Thousand Seven Hundred Dollars $2,700 per month (T. at 665). In 1986, the compensation scheme was changed to provide for a straight commission of the rentals of seven percent (7%), with no supervision charges (T. at 665).

A ten percent (10%) supervision fee was charged by Mr. Barozzini on expenditures which included: rental charges

on his own leased cars (T. at 671); telephone bills (T. at 672); gas, oil, parking, maintenance and insurance for the two cars used by Mr. Barozzini exclusively and leased by the Foundation (T. at 675); monthly trash collection bills (T. at 675); and the Pittsburgh Press bills (T. at 676).

From 1980 to 1985, Mr. Barozzini collected real estate commissions, supervision fees and automobile expenses totaling $221,883 (T. at 453–55).

\* \* \* \* \* \*

From 1980 to 1983, Mr. Barozzini leased two cars for the purpose of inspecting property belonging to the Foundation.... Expenditures made in connection with the [vehicles] were charged to [the subsidiaries]. From December of 1981 through May of 1983, Mr. Barozzini paid thirty percent (30%) of the lease for the Buick and seventy percent (70%) was charged to [a subsidiary].

(Trial court opinion at 21–22.) Barozzini and his two children used the cars to check on properties owned by the McGillick Co. two or three times a week. (*Id.*) Barozzini did not maintain mileage logs for either vehicle. (*Id.*)

Barozzini also maintained an "Agency Account" where he commingled personal funds with those of the Foundation. (*Id.* at 23–24.) Anania, accountant for the Foundation, never audited or reconciled this account; the Corbetts were unaware of the operation of the account and never reviewed any records of it. (*Id.*)

Barozzini received a 10% supervision fee on expenditures paid to construction companies owned by James Stevenson for work on properties controlled by the McGillick Co. and hence, the Foundation. (*Id.* at 24.) At the same time, Barozzini performed legal work for Stevenson's companies. (*Id.* at 25.) No competitive bids were obtained for the work on the properties performed by Stevenson's companies. (*Id.*) In summary, Barozzini "provided himself with every fee, commission, charge and expense possible, while at the same time depleting Trust assets." (*Id.* at 26.)

Diocese admits that between 1970 and 1986, it received $753,221.70 in distributions from the scholarship fund. (Diocese's brief at 10.) Diocese was unable to identify one recipient of a scholarship from these funds. (Trial court opinion, at 29.) These fund were deposited to the Diocesan general accounts. (Diocese's reply brief at 14.) The trial court found that all distributions from the scholarship fund had been appropriated by Diocese for its own purposes without regard for the settlor's intent. (Trial court opinion at 29.)

Before addressing the contentions of the parties, we note our standard of review. The factual findings of the Orphans' Court are entitled to the same weight given a jury verdict. *In Re Adoption of J.J.*, 511 Pa. 590, 594, 515 A.2d 883, 886 (1986). Where the auditing judge's findings have been confirmed by the court en banc, they are conclusive unless unsupported by the record. *In Re Estate of Lux*, 480 Pa. 256, 262, 389 A.2d 1053, 1056 (1978). Absent an abuse of discretion or error of law, the trial court's decision will not be disturbed. *In Re Adoption of J.J.*, *supra*. The trial judge determines witness credibility and the weight to be accorded the evidence. *Weir by Gasper v. Estate of Ciao*, 521 Pa. 491, 501, 556 A.2d 819, 824 (1989). With these standards in mind, we now examine the appeals *sub judice*.

Trustees raise four issues as to the propriety of the Orphans' Court hearing this petition: standing, capacity, unclean hands and laches; we dispose of these claims *seriatim*. Trustees assert that Diocese does not have standing to file this petition as Diocese is not a beneficiary of the scholarship fund. We agree that Diocese is not a beneficiary of this particular portion of the settlor's largess, however, we do not agree that this precludes Diocese from having standing to pursue this action.

Trustees contend that standing is precluded unless a party can "plead and prove an immediate, direct and substantial injury." (Trustees brief at 52, *citing, 1000 Grand-*

*view Assn., Inc. v. Mt. Washington Assoc.,* 290 Pa.Super. 365, 367, 434 A.2d 796, 797 (1981).) While true, this does not mean an economic injury must be present. "[I]t is clear that some interests will suffice to confer standing even though they are neither pecuniary nor readily translatable into pecuniary terms." *Wm. Penn Park, Inc. v. City of Pittsburgh,* 464 Pa. 168, 193, 346 A.2d 269, 281 (1975).

The very terms of the trust document establishing the scholarship fund indicate the intimate connection Diocese was to have with this fund. Diocese is to select the recipients of the scholarships; it must approve the educational institution chosen by each recipient; and it is to be involved in the establishment of the vocational school. We hold today that these obligations imposed by the settlor give Diocese standing to allege malfeasance by Trustees who are to administer the Foundation. These obligations give rise to a "substantial interest," an "interest other than the abstract interest of all citizens in having others comply with the law." *Id.,* 464 Pa. at 195, 346 A.2d at 282. *See also,* RESTATEMENT (SECOND) TRUSTS, § 391 (suit may be maintained by a person who has a special interest in the enforcement of the charitable trust). The intimate involvement of Diocese with the disbursement of the scholarships is such a special interest.

Trustees also contest Diocese's capacity to sue, claiming that, as an unincorporated association, this action must be brought in the name of a member as trustee *ad litem.* (Trustees' brief at 55, *citing* Pa.R.Civ.P. 2151, 2152.) Trustees cite the Roman Catholic Code of Canon Law, Canon 369, for the proposition that Diocese is an association of the people of God engaging in activities under a common name. Thus, Trustees contend, that Diocese is an unincorporated association under Rule 2151. Then–Bishop of the Pittsburgh Diocese, Anthony J. Bevilacqua, a canon as well as common law lawyer, testified that the Diocese of Pittsburgh is a public juridic person under canon law; in effect, Diocese and the Bishop are one in the same. (N.T., 12/7/88, at 42, 51.) Thus, Diocese argues that bringing suit

in the name of the Diocese is the equivalent of complying with Rule 2151.

We agree with Trustees that this case should have been brought in the name of the Bishop as trustee *ad litem.* *See, Alesczyk v. Glen Alden Corp.,* 53 Luz.L.Reg. 104, 29 Pa.D. & C.2d 138 (1962). Canon law declaring the Bishop and the Diocese as one in the same does not apply in our civil law system. Nonetheless, this deficiency in the pleadings does not compel us to remand this case with direction to dismiss. A party may amend his pleadings to correct the name of a party. Pa.R.Civ.P. 1033, 42 Pa.C.S.A. Such amendments are allowed even after an appeal has been taken from a judgment and award. *Sullivan v. Allegheny Ford Truck Sales,* 283 Pa.Super. 351, 357, 423 A.2d 1292, 1295 (1980). Absent prejudice to the opposing party, such amendments to the pleadings are to be liberally allowed; the goal of the judicial system is to secure a determination on the merits, not enforce technical rules of pleading. *Gallo v. Yamaha Motor Corp., USA,* 335 Pa.Super. 311, 313, 484 A.2d 148, 150 (1984).

Trustees have not, and apparently cannot, argue that an amendment changing the named party to the Bishop as trustee *ad litem* for the Diocese prejudices them. No new party is added to the action; no new theory of liability is presented; no new discovery or evidence is necessary. Trustees have known since the inception of this dispute which entity has sought equitable relief; the failure to correctly name the party is a technical defect which can be cured by amendment. *See, Commonwealth, Liquor Control Board v. Rapistan, Inc.,* 14 Pa.Cmwlth. 501, 503, 323 A.2d 410, 412 (1974), *rev'd on other grounds,* 472 Pa. 36, 371 A.2d 178 (1976). Accordingly, Diocese is directed upon remand to amend its pleadings to bring this action in the name of the now Bishop as trustee *ad litem* for Diocese.

▮▮▮ Trustees attempted to procedurally bar this petition by raising the doctrine of unclean hands. Specifically, Trustees claim that as Diocese has misappropriated the disbursements made under the scholarship fund, it is pre-

cluded from pursuing this action. Again, we disagree. It is true that one who seeks equitable relief must appear before the court with clean hands. *Mazer v. Sargent Electric Co.*, 407 Pa. 169, 173, 180 A.2d 63, 65 (1962). One guilty of wrongdoing should be denied access to the court. *In Re Estate of Pedrick*, 505 Pa. 530, 543, 482 A.2d 215, 222 (1984). The doctrine is applicable when the wrongdoing directly relates to the matter in controversy and affects the relationship between the parties. *Jackson v. Pelusi*, 379 Pa.Super. 361, 371, 550 A.2d 199, 204 (1988).

The record supports the trial court's finding that Diocese has not complied with the obligations of the trust in handling the disbursements made under the scholarship fund. This does not however, mandate application of the equitable maxim. Unclean hands will not be invoked where its application will produce inequitable results, especially where the rights of innocent parties are involved. *Universal Builders, Inc. v. Moon Motor Lodge, Inc.*, 430 Pa. 550, 558, 244 A.2d 10, 14 (1968). The chancellor may refuse to apply the doctrine if, on the merits, an inequitable result will be reached. *Shapiro v. Shapiro*, 415 Pa. 503, 507, 204 A.2d 266, 268 (1964).

In light of the record, we see no abuse of discretion in the trial court's failure to dismiss this petition due to Diocese's unclean hands. While it is true that Diocese has not acted in accord with the terms of the trust, the record is replete with evidence that Trustees abused their position in their administration of the Foundation. Dismissal of this petition would clearly lead to an inequitable result adversely affecting the rights of potential scholarship recipients; this we will not do.

 Both parties also complain about the period of time examined by the trial court. Trustees argue that the doctrine of laches dictates that the petition be dismissed or the examination be limited to the period 1983–1986. The Diocese argues that laches is inapplicable and that, as they have documented alleged abuses of trust as far back as

1970, the trial court should have examined the period 1970–1986. We disagree with both contentions.

We agree with Trustees that the laches doctrine applies to actions regarding the enforcement and interpretation of trust agreements. *See, DiLucia v. Clemens*, 373 Pa.Super. 466, 472, 541 A.2d 765, 768, *alloc. denied*, 520 Pa. 605, 553 A.2d 968 (1988). A party asserting laches must show a delay arising from the other party's failure to exercise due diligence, and resultant prejudice. *Kehoe v. Gilroy*, 320 Pa.Super. 206, 212, 467 A.2d 1, 4 (1983). The trial court ruled that it would examine the period 1980–1986, as a fire occurred in 1980 which might impair the Trustees' ability to defend this action. (Trial court opinion at 8.) It is true that Diocese was aware of the existence of the Foundation as early as 1956 and was monitoring Trustees' activities as early as 1968. (N.T., Vol. IV, at 1340.) Thus, there is no difficulty in finding that Diocese did not exercise due diligence. Nonetheless, by limiting the period of inquiry, the trial court prevented prejudice to Trustees. To the extent the fire hindered the defense, events occurring before the fire did not substantially impact the trial court's decision.

Trustees claim that witnesses to the events in question have died, preventing an adequate defense. No specific claims as to what evidence those witnesses would have presented, or that any witness to an event subsequent to 1980 has died, has been presented. Absent such a concrete showing, this claim is meritless. *Miller v. Hawkins*, 416 Pa. 180, 192, 205 A.2d 429, 435 (1964). By restricting the examination to the post–1980 period, the trial court prevented any prejudice to Trustees. Thus, laches does not require dismissal of Diocese's petition.

▮ Trustees' final laches argument is that the trial court should have only considered the period 1983–1986. Trustees rely on *Kay v. Kay*, 460 Pa. 680, 334 A.2d 585 (1975), for the proposition that relevant statutes of limitations may be used to provide guidance as to the reasonableness of delay. Next, Trustees assert that the contractual limitations statute [42 Pa.C.S.A. § 5525] is most analogous

to a written trust agreement, and so should limit the inquiry to the period 1983–1986. We do not agree.

Initially, the *Kay* Court was careful to note that statutes of limitations are not controlling in equity. *Id.*, 460 Pa. at 684, 334 A.2d at 587. Further, the trial court opinion is clear that the ongoing course of conduct from 1980–1986 led to its decision to order the Trustees' removal. Trustees have not argued, and indeed we see no basis for arguing, that, had the trial court only examined the period 1983–1986, the same course of conduct would not have led to the same result. Thus, if it was error to examine the period 1980–1982, it was harmless error at best.

Diocese claims that the trial court should have examined all evidence relating to the period 1970–1986. As noted above, the Diocese was aware of Trustees' activities as early as 1956. Thus, we see no error in the trial court's limiting its inquiry to the period 1980–1986 as Diocese did not exercise due diligence. Diocese claims that Trustees have not shown prejudice because they have not demonstrated any evidence lost in the 1980 fire. We disagree. It is precisely because the passage of time has made it impossible to ascertain what may or may not have been destroyed that the trial court limited its inquiry. We find no error here.

Diocese's major complaint is the trial court's failure to surcharge Trustees for excessive fees and commissions. Initially, we note that the trial court never made an express finding that either of the Corbetts or Anania charged excessive fees to the Foundation. The Corbetts and Anania were removed for their failure to actively participate in the management of the Foundation.[1]

---

1. There is also evidence that F. Corbett engaged in self-dealing by renting premises from a Foundation subsidiary. Further, the record is clear that no annual accounting as required by the trust document was ever filed. At argument, counsel for Trustees argued that, as they had filed annual tax returns with the IRS and statements with the Pennsylvania Attorney General, they should be excused from failing to file the annual accountings. We find this argument puzzling. We see no basis for holding that compliance with statutorily imposed duties

Diocese argues that a finding of abdication automatically implies that any fees received by the Corbetts were excessive. Further, Diocese cites extensive excerpts from the record which indicate that Anania's accounting fees were excessive. Omitted from this list is the countervailing expert testimony that Anania's fees were not excessive. We see no error in the trial court's refusal to surcharge the Corbetts or Anania. The record shows no fees beyond the annual salary was received by the Corbetts. The trial court was free to accept the testimony that Anania's accounting fees were not excessive.

 The purpose of a surcharge is reimbursement for losses, not punishment of the fiduciary guilty of nonfeasance. *Freedman Estate*, 1 Pa.Fiduc.Rep.2d 60, 68 (Alleg.Co.1980) *aff'd.*, 307 Pa.Super. 413, 453 A.2d 651 (1982). Here, no losses were attributed to the Corbetts or Anania; it was not error for the trial court to deny Diocese's request for the surcharge.

 Diocese's request for a surcharge against Barozzini is likewise faulty. Barozzini was removed for self-dealing, among other defalcations. (Trial court opinion at 26.) In essence, the Corbetts and Anania allowed Barozzini to run the Foundation and he took full advantage of that abdication. The Diocese relies heavily on the trial court's finding that Barozzini "provided himself with every fee, commission, charge and expense possible, while at the same time depleting Trust assets." (*Id.*) Noticeably absent from this language is any finding that any fee or commission charged by Barozzini was excessive or that any loss to the Foundation was attributable to his conduct.

More importantly, Diocese argues as if it were entitled to a surcharge as of right. A surcharge is one of a variety of remedies which the Orphans' Court may impose for mismanagement of a trust fund. *Freedman Estate, supra.* Other possibilities include removal or injunction. The Or-

excuses non-compliance with the express provisions of the trust document.

phans' Court is endowed with all chancery powers. *La-Rocca Trust*, 411 Pa. 633, 637, 192 A.2d 409, 411 (1963). This includes the power to select which remedy it considers most appropriate to effect an equitable result. We agree that a trustee may be compelled to refund excess compensation. *See, In Re Beaver Trust Co.'s Appeal*, 146 Pa.Super. 545, 22 A.2d 111 (1942). Nonetheless, absent an abuse of discretion, we will not second guess the trial court's choice of which remedy is appropriate in a given factual situation. We see no abuse of discretion in the decision to refuse to impose a surcharge in addition to removal.

■■■ Diocese's final argument has merit. Trustees were advanced $30,839.41 for legal fees and costs associated with the defense of this action. Such fees were allowed with the express provision that if Trustees lost this case, they would be liable for this amount. (R.R. at 1762–65a.) Trustees argue that, as no surcharge was imposed, they have won a portion of the case and are entitled to the advance. We disagree.

Trustees, like Diocese, have confused one of the available remedies with a cause of action. Mere avoidance of one of a plethora of penalties which the Orphans' Court could impose does not amount to a victory for Trustees. The trial court order clearly removes for cause all the defendants as trustees of the Foundation. We find this difficult to classify as prevailing on the merits of the case. A trustee who successfully defends an action for removal is entitled to costs out of the trust estate. *Coulter Estate*, 379 Pa. 209, 219, 108 A.2d 681, 686 (1954). A trustee who is removed for cause is personally liable for such costs. P.L.E., Trusts, § 419. Here the Trustees were removed for cause; by the terms of the express provision, they are liable for the amount of the advance.[2]

■■■ Trustees argue that there was insufficient evidence to justify their removal. Again we disagree. It is

2. The same reasoning leads us to refuse Trustees' request that the Foundation pay all legal fees and costs associated with these proceedings.

true that removal of a trustee is a drastic remedy which should be employed only when clearly necessary. *In Re White*, 321 Pa.Super. 102, 104, 467 A.2d 1148, 1150 (1983), *rev'd. on other grounds*, 506 Pa. 218, 484 A.2d 763 (1984). An order removing a trustee will only be reversed however, if there has been an abuse of discretion. *Crawford's Estate*, 340 Pa. 187, 190, 16 A.2d 521, 523 (1940).

Trustees cite us to the Decedents, Estates and Fiduciaries Code as delineating the grounds for removing a trustee. *See, In Re White, supra, citing* 20 Pa.C.S.A. § 7121. A trustee may be removed if "the interests of the estate [or trust] are likely to be jeopardized by his continuance in office." 20 Pa.C.S.A. § 3182(5). The record supports the finding that the continuation of this group of fiduciaries jeopardizes the Foundation. That finding having been affirmed by the Orphan's Court en banc, it is conclusive as it is supported by the record. *In Re Estate of Lux, supra.*

 Anania and the Corbetts were removed for abdicating their office and allowing Barozzini a free hand to run the Foundation as his personal satrapy. As fiduciaries, trustees are expected, at a minimum, to participate in the administration of the trust. RESTATEMENT (SECOND) TRUSTS, § 184. By their conduct, Anania and the Corbetts allowed the Foundation to be mismanaged. Clearly, their continuation in office jeopardizes the Foundation.[3]

 Barozzini commingled personal and Foundation funds in the agency account.[4] Barozzini also engaged in

---

3. Trustees argue that the trust document establishing the Foundation allows for the appointment of one trustee to act for all. Such provisions are effective. *See*, RESTATEMENT (SECOND) TRUSTS, § 171. We are concerned, however, with what did happen, not what might have happened or could have been done. No evidence that any such appointment was made has been presented. Absent any such appointment, Anania and the Corbetts are chargeable, not only with their own actions, but also with those acts of their co-trustees which their failure to exercise reasonable care allowed to occur. RESTATEMENT (SECOND) TRUSTS, § 224(2)(d). Accordingly, we disregard this argument.

4. At argument, counsel for Barozzini argued that commingling did not occur as follows: Foundations funds were deposited to the agency

self-dealing. The record supports these findings, therefore they are conclusive. His continuation as a trustee is not in the best interest of the Foundation. We see no abuse of discretion in the trial court's removal of Trustees.

 Trustees argue that the trust agreement contains an exculpatory provision relieving them of liability for their acts while in office. Generally, such provisions are given effect. *Estate of McCredy*, 323 Pa.Super. 268, 296, 470 A.2d 585, 600 (1983). Nonetheless, we will not honor such a clause if by doing so we will violate public policy. *In Re Estate of Janney*, 498 Pa. 398, 401, 446 A.2d 1265, 1266 (1982) (citations omitted). Self-dealing, commingling of funds, and abdication of responsibilities by fiduciaries runs counter to the core concept of the duty of a fiduciary. "A person having duty, created by his undertaking, to act primarily for another's benefit in matters connected with such undertaking." BLACK'S LAW DICTIONARY, 5th Ed., p. 563. We see no abuse of discretion in the trial court's failure to give effect to the exculpatory provision as it would violate public policy to allow Trustees to escape the consequences of their nonfeasance and malfeasance.

 Trustees' final argument is meritorious. As a group, Trustees continued to manage the affairs of the Foundation during the pendency of this action. "The ultimate rule is compensation for services rendered." *In Re Henry's Estate*, 341 Pa. 439, 449, 19 A.2d 66, 71 (1941). The trial court must determine the amount of reasonable compensation, if any, due Trustees for services rendered during this period. We will not, however, allow Trustees to set their rate of compensation for their services. Trustees

account, Barozzini did not deposit his own funds to that account, rather he merely failed to withdraw his fees as they came due, thus as Barozzini did not deposit personal funds he did not commingle. We disagree. The trial court found that Barozzini paid personal expenses from the account, in effect, he treated those funds as his own, commingling his fees with the funds of the Foundation.

are ordered to submit detailed summaries of their services rendered during the pendency of these proceedings and the trial court shall determine if any compensation is due Trustees for same.[5]

In summary, we find that Diocese has standing to pursue this action but must amend its pleadings to bring this petition in the name of the Bishop as trustee *ad litem*. We further find no error in the trial court's choice of the period to be examined or in its refusal to dismiss this petition under the doctrine of unclean hands. The findings as to the nonfeasance and malfeasance of Trustees, having been confirmed by the Orphans' Court en banc and being supported by the record, are conclusive and will not be disturbed by this Court. Nor will we invade the trial court's discretion in its choice of which remedy to apply by awarding a surcharge in addition to the removal of Trustees. We remand this case for this trial court to specifically determine what fees, if any, Trustees are entitled to and to order Trustees to repay all amounts advanced for legal fees and expenses related to the defense of this action.

Order of the trial court affirmed in part and vacated in part. Case remanded for proceedings in accord with the above decision. Jurisdiction relinquished.

---

**5.** We note that any services related to the defense of these proceedings are not compensable as our decision above makes clear that Trustees are not entitled to costs or fees because they are being removed for cause.