J-A23036-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ESTATE OF ROBERT J. ROSEMEIER, DECEASED | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: LORRIEANN P. ROSEMEIER | : : : : : : : | |
| | : | No. 1502 MDA 2021 |

Appeal from the Order Entered October 25, 2021
In the Court of Common Pleas of Clinton County Orphans' Court at
No(s):  2019-00204


BEFORE:   BOWES, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY McCAFFERY, J.:                    **FILED JULY 18, 2023**

Lorrieann P. Rosemeier (Appellant) appeals from the order entered in the Clinton County Court of Common Pleas denying the following: (1) her appeal from the decree of the Register of Wills admitting the October 20, 2015 will (the 2015 Will), of her late husband, Robert J. Rosemeier (Decedent), to probate; and (2) her petition to remove Steven P. Poorman as personal representative to Decedent's estate (the Estate).  Appellant challenges the orphans' court findings that Poorman overcame his burden in demonstrating a lack of undue influence regarding Decedent, and there was no conflict of interest between Poorman and the Estate.  She also complains that the court erred in admitting certain evidence.  After review of the record, we affirm, in part, the orphans' court order to the extent it denied her appeal from the

_____

[*] Former Justice specially assigned to the Superior Court.

decree admitting the 2015 Will to probate, and reverse, in part, the denial of her request to remove Poorman as the Estate's personal representative.

## I.    Facts and Procedural History

We glean the underlying facts as summarized by the orphans' court in its October 25, 2021, opinion as follows:

1. [Decedent] died on November 18, 2019.

2. At the time of his death, Decedent was the husband of [Appellant].

3. Decedent and [Appellant] were married in September of 2008.

4. On March 13, 2009, Decedent and [Appellant] executed reciprocal Last Wills and Testaments, which were introduced as [Appellant's] Exhibits #1 and #2.

5. Decedent's 2009 Last Will and Testament will hereinafter be referred to as "2009 Will[."]

6. In Decedent's 2009 Will, [Appellant] was named the beneficiary of the residue of Decedent's [E]state as well as the executrix of Decedent's [E]state.

7. The 2009 Will has not been located and was therefore not produced at the time of evidentiary hearing.[1]

8. Decedent executed a subsequent Last Will and Testament dated October 20, 2015.

\*    \*    \*

10. Decedent's 2015 Will appointed Stephen P. Poorman to serve as Executor of the Estate of Robert J. Rosemeier and specifically

---

[1] Appellant did not know the whereabouts of Decedent's original 2009 Will. At the January 12, 2021, hearing Appellant admitted a copy of the 2009 Will into evidence as Exhibit 1.  N.T., 1/12/21, at 50-55.

disinherited all potential family heirs of Robert J. Rosemeier, including [Appellant], his surviving widow.[2]

11. Decedent's 2015 Will bequeathed the entire Estate to a charitable trust to be referenced as "The Robert J. Rosemeier Charitable Trust[."]

12. [Poorman] was named as the Trustee for the Rosemeier Trust.

13. [Poorman, as] Trustee was granted the authority to liquidate the assets, manage the funds and "at his sole discretion, mak[e] donations of the Trust funds to any charitable organizations that [Decedent] deems appropriate."

14. Poorman is the principal and sole shareholder of Stephen Poorman and Company.

15. Stephen Poorman and Company is a management consulting firm specializing in turn-arounds, work-outs and bankruptcies.

16. Poorman has been engaged in this type of business for [40] years.

17. Poorman first provided services to the Decedent and [Appellant] in 2011.

18. Poorman's 2011 services included advice and assistance with financial and real estate matters.

19. Specifically, Poorman became involved in assisting Decedent and [Appellant] with renewing or leasing Clinton County real estate.

20. In the course of providing services, Poorman became concerned that [Appellant] was making business decisions resulting in tenants moving from their rentals and that [Appellant] was acquiring cash and business assets for the purpose of converting the assets to the benefit of her sons.

21. Decedent and [Appellant lived in Lock Haven Pennsylvania, but] relocated to North Carolina sometime between 2011 and 2014.

_____

[2] Appellant waived her right as a spouse to take an elective share against Decedent's 2015 Will. *See* Waiver and Release of Right of Election, 8/5/22.

22. In the summer of 2014, Decedent returned to Lock Haven.

23. [Appellant] remained in North Carolina and never returned to Clinton County.

24. During his lifetime, Decedent conducted business in Clinton County and was the founder of the Collision Center.

25. The Collision Center consisted of a 50,000 square foot warehouse and a dialysis center.

26. Decedent also owned real estate in Tioga County and Clinton County, Pennsylvania, as well as in North Carolina.

27. As reported by Carol Hartman, an employee of the Collision Center since 1997, Decedent stated that he returned to Lock Haven because he was thrown out of his house and simply wanted to come home.

28. Shortly after returning to Lock Haven, Pennsylvania, Decedent sought out the assistance of Poorman.

29. Decedent and Poorman had known each other for approximately [30] years.

30. Decedent advised Poorman that he was concerned that [Appellant] and her children were liquidating business assets, causing the business to operate at a loss and requested Poorman's assistance with an audit.

31. Upon investigation, Poorman identified various issues that needed to be addressed including a private airplane and boat, various properties in foreclosures, and the physical deterioration of the Collision Center.

32. Poorman discovered that water was entering the building through the roof of the Collision Center.

33. Poorman's audit confirmed that [Appellant] was distributing money and business assets to her children without providing for repayment, that real estate was being sold for an undervalued price, and that assets were being pledged for new cash loans.

34. Poorman's audit also revealed that [Appellant's] sons were receiving high salaries from the Collision Center, but were ignoring business obligations including taxes.

- 4 -

35. Poorman determined that the business had a negative cash value of $151,000.00.

36. Carol Hartman, a longtime employee of the Collision Center, agreed with Poorman's findings.

37. In response to the audit, Poorman located tenants for Decedent's vacant rental properties and found contractors to renovate the properties.

38. With respect to the Collision Center, Poorman entered into renegotiations for outstanding contracts, which included a contract to repair the building's roof.

39. Poorman, either individually or through his company . . . entered into loan agreements with Decedent which enabled the Collision Center to make payroll and make business related expenses.

40. At the time Poorman and/or his company loaned money to Decedent, the Collision Center had been identified as a risk and was unable to borrow money on its own.

41. In November of 2014, Decedent executed a power of attorney for management appointing Poorman and his company as his attorney-in-fact.

42. The power of attorney was prepared by the law offices of Rosamilia, Brungard and Rosamilia.[3]

43. It was and remains the standard operating procedure for Poorman and/or his company to require a power of attorney in connection with providing services to clients.

44. Poorman bills $150.00 per hour for his services and billed Decedent at this standard rate.

45. Decedent or his [E]state has paid Poorman between $300,000.00 and $500,000.00 for services provided in connection with the power of attorney.

46. During Poorman's audit and review of the Collision Center's books and supporting records, Poorman discovered that the

---

[3] The law offices of Rosamilia, Brungard and Rosamilia are presently representing the Estate in this appeal.

Collision Center had been sold to [Appellant's] two sons for a fraction of the true value.

47. Specifically, 100% of the stock of the Collision Center was transferred into a new corporation owned by [Appellant's] sons for the sum of $25,000.00.

48. The $25,000.00 was not actually paid for the purchase.

49. Upon this discovery, Poorman contacted the law offices of Rosamilia, Brungard and Rosamilia, to explore the possibility of undoing the transfer of the stock to [Appellant's] two sons.

50. Poorman had no previous professional relationship with the law firm.

51. Poorman was successful in undoing the stock transfer.

52. Poorman took over the management of the Collision Center, charging Decedent $9,000.00 per month for management services.

53. Poorman had direct contact with Decedent five to six days a week from August of 2014 through the end of 2016.

54. Beginning at the end of 2016, Poorman and Decedent met weekly or bi-weekly at best.

55. Decedent physically appeared at Poorman's office essentially seven days a week, arriving at 10:00 a.m. and remaining in the office until 5:00 or 6:00 p.m. reportedly to work on business problems.

56. Before going to Poorman's office Decedent would make a stop at the Collision Center, interacting with customers and employees.

57. In addition to providing management for Decedent's businesses, Poorman and his company's employees took over the role of Decedent's personal caregiver; taking efforts to assure that Decedent's daily needs were met.

58. Poorman or his employees took Decedent to doctor's appointments, shopping, and out for daily meals.

59. This personal care lasted approximately two years during which time Decedent had no contact with his family or [Appellant].

60. Following his return to Clinton County, Decedent strongly advised Poorman that he did not want [Appellant], her children, or his own relatives to inherit money from his [E]state.

61. Decedent was upset that an attorney had included [Appellant's] name on various real properties.

62. Decedent's request that [Appellant], her children and his blood relatives have no interest in his [E]state was confirmed by Doris Jodun, a retired former accountant and manager of Poorman's company, as well as Carol Hartman, an employee at the Collision Center.

63. Poorman advised Attorney R. Thom Rosamilia, in writing, of Decedent's wishes regarding his [E]state.

64. On or about June 27, 2015, Decedent signed a statement confirming his desire that he did not want his son, Mark Rosemeier, his daughter-in-law, Brenda Rosemeier, his granddaughter, [K.R.], [Appellant] or any of [Appellant's] children to receive any of his assets but instead, requested that his assets be distributed by Poorman to Clinton County charitable organizations.

65. Decedent opined that his family had abused his generosity and then failed to support him in his later years.

66. Decedent's June 27, 2015[,] written and signed directive was confirmed on October 8, 2015[,] by signing a further written statement disinheriting [Appellant], her children[,] and his blood relatives.

67. Decedent was upset that his family members did not come to see him although living a short distance away.

68. Poorman referred Decedent to Attorney R. Thom Rosamilia of the firm Rosamilia, Brungard and Rosamilia.

69. As a result of consultation with Attorney Rosamilia, Decedent executed a new Will (2015 Will) at [Attorney] Rosamilia's law office in the presence of a notary public.

70. Decedent received travel assistance from Poorman's employees to the Rosamilia law office for the purpose of executing the 2015 Will.

71. Poorman was not present at the time of the execution of the 2015 Will.

72. The 2015 Will disinherited [Appellant], Decedent's son, Mark Rosemeier, Decedent's daughter-in-law, Brenda Rosemeier, and their issue.

73. As previously discussed the entire Estate was bequeathed to a Charitable Trust, naming Poorman as Trustee.

74. The Trust awarded Poorman reasonable compensation from the Trust funds at a rate similar to Poorman's traditional business billing rate.

75. Poorman was also appointed Executor of the 2015 Will and again was authorized to charge a reasonable billing rate.

76. Grant of Letters were issued to Poorman by the Clinton County Register of Wills on November 25, 2019.

77. It is Poorman's intention to donate Decedent's [E]state to nine charities.

78. Six of the nine charities have previously been supported by Poorman for which he has received naming rights.

79. Poorman will not receive intangible benefits resulting from the support of any of the selected charitable organizations.

80. Poorman does not intend to seek Trustee fees in connection with the [E]state.

81. Poorman has claimed Executor fees for the administration of the [E]state through June 30, 2019.

82. On October 20, 2015, Carol Hartman executed a statement opining that Decedent, with which she had been a long-term acquaintance, was very alert.

83. Carol Hartman also stated that [Appellant] once stated "I married [Decedent] for his money[."]

84. On November 19, 2015, Decedent testified in a foreclosure action brought against him by Jersey Shore State Bank.

85. At the time of the foreclosure proceeding, Decedent demonstrated a lack of awareness of where he was and what he was doing.

86. On December 9, 2015, Decedent executed a durable healthcare power of attorney in favor of Poorman.

87. On January 14, 2016, this Court appointed Justin K. Houser, Esquire, as Guardian Ad Litem [(GAL)] of [Decedent] to secure a competency evaluation.

88. On February 5, 2016, Poorman, in his capacity as Power of Attorney for Decedent, entered into a promissory note with Decedent and Collison Industries, Inc., in the amount of $95,880.00 with interest at the rate of 12% per annum.

89. Poorman had been unsuccessful in acquiring a loan from Woodlands Bank and Santander Bank.

90. The note was secured by a mortgage.

91. Poorman attempted to acquire additional loans for Collision Industries but was unsuccessful.

92. Poorman then leased vehicle repair equipment to the Collision Center and Decedent personally so that the company could continue operations and comply with insurance company contracts.

93. These additional loans totaled approximately $125,000.00.

94. The loan documents were signed by Poorman in his own capacity and as Power of Attorney on behalf of Decedent and as President of Collision Industries, Inc.

95. Poorman received a resolution approving the loans from the Board of Directors and shareholders of the business.

96. Poorman did not participate in the vote.

97. Since Poorman became involved with the Collision Center it has shown a profit for six consecutive years, has made significant gains in the vicinity of $6,483,000.00 and has continued to employ [14] workers.

98. Carol Hartman confirmed that Poorman's actions contributed to the survival and solidification of the business.

99. Attorney Houser secured a competency evaluation for Decedent by Steven R. Hendricks, D.O., in February of 2016.

100. Dr. Hendricks is well-known to the Court and was qualified as an expert witness in the areas of osteopathic medicine and psychiatry.

101. Dr. Hendricks diagnosed Decedent with unspecified dementia, alcohol dependence and major depressive disorder.

102. Dr. Hendricks found that Decedent was not capable of handling his own affairs as of the time of the evaluation in February of 2016.

103. Dr. Hendricks concluded that Decedent experienced some impairment prior to February 2016, but was unable to specify as to when and to what extent.

104. Dr. Hendricks was unable to diagnose the type of dementia suffered by Decedent.

105. Dr. Hendricks had not examined Decedent prior to February of 2016.

106. Dr. Hendricks opined that Decedent's condition was worse in February of 2016 than it would have been in October of 2015, but was unable to pinpoint a specific date when Decedent would no longer have been able to make decisions on his own.

107. Decedent had a history of heavy alcohol use.

108. Poorman noticed Decedent having trouble understanding things in late 2015 when Decedent demonstrated the inability to recall details with regard to the business.

109. Poorman has filed a notice of claim against Decedent's Estate in the amount of $101,110.96, as well as a complaint and confession of judgment.

Orphans' Ct. Op., 10/25/21, at 2-11 (unpaginated).

On November 25, 2019, the 2015 Will was admitted to probate before the Register of Wills of Clinton County and Poorman was qualified as an executor of the Estate.

On February 3, 2020, Appellant appealed from the decree admitting the 2015 Will to probate and granting letters testamentary therein. Thereafter,

on March 31, 2020, she also filed a petition for rule to show cause why an appeal from the decree admitting the 2015 Will to probate should not be sustained to permit the Register of Wills to receive and act upon the 2009 Will.

As mentioned above, during this time, Poorman filed a notice of claim in the amount of $101,110.96 against the Estate. He also filed a complaint and confession of judgment, on the basis of the original loan related to repairs to the company and because of the additional loans he provided to Decedent to pay back taxes.

On January 12, 2021, and April 27, 2021, the orphans' court held hearings regarding Decedent's mental state around the time he executed the 2015 Will, his assets, and his familial relationships, which is described above.

At both hearings, Poorman was questioned about ensuing litigation: (1) a notice of claim he filed against the Estate;[4] and (2) a complaint and confession of judgment he filed against himself as executor of the Estate and Collision Industries.[5] At the January hearing, the following exchanges took place where Poorman was questioned about his rationale behind the litigation:

> [Poorman: B]ecause [Appellant] is suing me, I directed the attorney . . . to take whatever precautions he could . . . to secure my lien position on the loan given the death and [Appellant's] litigation. What [the attorney] filed, I'm not certain, but I think it was a confession of judgment which is . . . on the banks notes. And as far as a claim against the bankruptcy [E]state, I was

---

[4] *See* Appellant's Exhibit 14.

[5] *See* Appellant's Exhibits 15 and 16.

advised . . . that I could not make any claims for fees until the [E]state is settled in the future.

\* \* \*

[Appellant: P]oorman, the caption of this complaint and confession of judgment . . . is Stephen P. Poorman, Plaintiff, versus Stephen P. Poorman, Executor of the Estate of [Decedent] and Collisions Industries, Inc., Defendant. Does that sound correct?

[Poorman]: I don't know.

[Appellant]: But you do know you filed a complaint on behalf of yourself as an executor of [the E]state?

[Poorman]: I don't know how [the attorney] captioned the confession of judgment.

[Appellant]: But was it your understanding that a complaint would be filed on behalf of yourself against yourself as Executor of [the Estate]?

[Poorman]: That's not my understanding. It would be that I filed the Complaint myself against the [E]state to protect the loan. That's all I know.

N.T., 1/12/21, at 97-98, 102-03; **see also** N.T., 1/12/21, at 100 (Poorman testifying that he loaned money to Decedent and Collision Industries for new lighting systems, repairs to building doors and the parking lot, and to pay outstanding revenue tax debt). At the April hearing, the following exchange occurred regarding the confession of judgment Poorman filed against the Estate:

[Appellant]: Could you explain why you decided to file a confession of judgment against the Estate?

[Poorman]: We do that when there's a death or a default to secure our loans. In this particular case, I took that action because [Appellant] has been suing me for about [4] years, maybe longer,

and so I retained an out-of-town law firm to protect my interest in the loan.

N.T., 4/27/21, at 29.

Poorman further testified at the April hearing that in an October 8, 2015, statement, signed by Jodun and himself, Decedent emphatically said he did not want his family "to get, in [Decedent's] words, a God damn thing" from the Estate due to their strained relationship. N.T., 4/27/21, at 23. After this conversation, Poorman suggested Decedent see an attorney. *Id.* Poorman added that while he was working with Decedent, Appellant never contacted Decedent. *Id.* at 26. Poorman reached out to Appellant and other family members "in an attempt to get them to communicate[,]" but Appellant "would never take the call or [would] hang up." *Id.*

Appellant also testified at the April hearing that she did not kick Decedent out of their North Carolina home[6] and that Poorman never attempted to contact her regarding Decedent. N.T., 4/27/21, at 106-08. Moreover, Appellant alleged that she did have contact with Decedent and visited him numerous times between 2014 and his passing. *Id.* at 100-01.

Relevant to this appeal, Appellant objected to the Estate's Exhibits 1 through 6, and 10 at the April hearing. The exhibits included signed statements from Poorman, Decedent, Appellant's sons, former employees of Poorman and the Collision Center, and graphs compiled by Poorman regarding

_____

[6] Appellant testified Decedent "wanted to go back to Lock Haven to teach the boys about the Collision Center. . . ." N.T., 4/27/21, at 106.

the Collision Center's financial information. The court held the objections for Exhibits 1 through 3 under advisement. N.T., 4/27/21, at 41, 116. At the conclusion of the hearing, the court ordered the parties to file the following: (1) memorandums of law regarding the objections to Exhibits 1 through 3 from Appellant, the Estate, and the GAL; (2) an affidavit of authenticity from the Estate concerning Exhibits 4 through 6, and 10; and (3) after the court issued a ruling on Exhibits 1 through 3, briefs from Appellant, the Estate, and the GAL, including proposed findings of fact, conclusions of law, and discussion. *See* Order, 4/28/21, at 1-2 (unpaginated).

On May 10, 2021, the orphans' court issued an order overruling Appellant's objections and admitted Exhibits 1 through 3. *See* Order, 5/10/21. On June 1st, Poorman, acting as executor of the Estate, complied with the court's April 28, 2021, order and provided an affidavit of authenticity for the remaining exhibits.

On October 25, 2021, the orphans' court issued an order and opinion denying Appellant's appeal from the decree of the Register of Wills admitting the 2015 Will to probate, and her petition to remove Poorman as personal representative and appoint administrator *pendente lite*. *See* Order, 10/25/21. Appellant filed this timely appeal and complied with the court's order to file a

concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The court filed a Pa.R.A.P. 1925(a) opinion on January 10, 2022.[7]

## II. Questions Presented

On appeal, Appellant raises the following six claims:

1. Whether, under relevant law, the orphans' court erred in finding the absence of undue influence by clear in convincing evidence[?]

2. Whether, under relevant law, the orphans' court erred in finding by clear and convincing evidence that [Decedent] executed the 2015 Will independent of any influence, undue or otherwise, exercised by . . . Poorman[?]

3. Whether, under relevant law, the orphans' court erred in finding that no conflict of interest exists when . . . Poorman filed a Notice of Claim against the Estate in the amount of $101,110.96, obtained a judgment by confession against the Estate in the amount of $226,066.64, and is a defendant in a pending civil action in which [Decedent], and now his [E]state, is a plaintiff[?]

4. Whether, under relevant law, the orphans' court erred in admitting into evidence and considering [the Estate's] Exhibits 1, 2, and 3 over objection[?]

5. Whether, under relevant law, the orphans' court erred in admitting into evidence and considering Exhibits 4, 5, 6, and 10 over objection[?]

6. Whether, under relevant law, the orphans' court erred in appointing a [GAL] for the Estate, *sua sponte* and without issuing an appropriate order, and directing [Appellant] to pay the costs and expenses[?]

---

[7] Both of the orphans' court's opinions — filed October 25, 2021, and January 10, 2022 — address issues relevant to the present appeal. As such, we reference both in our analysis.

Appellant's Brief at 3-4. Based on the nature of Appellant's claims, we will address the first two issues together, the third issue, then the fourth and fifth issues together, and lastly, Appellant's sixth issue.

## III. Standards of Review

When reviewing an appeal from a decree of the orphans' court, we apply the following standard:

> In a will contest, the hearing judge determines the credibility of the witnesses. The record is to be reviewed in the light most favorable to appellee, and review is to be limited to determining whether the [orphans' c]ourt's findings of fact were based upon legally competent and sufficient evidence and whether there is an error of law or abuse of discretion. Only where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence may the court's findings be set aside.

*In re Est. of Byerley*, 284 A.3d 1225, 1236 (Pa. Super. 2022).

As for our review of a determination concerning the removal of a personal representative, it "is a matter vested in the sound discretion of the trial court, and thus we will disturb such a determination only upon a finding of an abuse of that discretion." *In re Estate of Mumma*, 41 A.3d 41, 49 (Pa. Super. 2012).

## IV. Undue Influence

Appellant's first two claims allege the orphans' court erred in concluding Poorman did not exert "undue influence" over Decedent when he executed the 2015 Will, and therefore the will should be invalidated.

Our Supreme Court has defined "undue influence" as follows:

- 16 -

The word "influence" does not refer to any and every line of conduct capable of disposing in one's favor a fully and self-directing mind, but to control acquired over another that virtually destroys his free agency . . . . In order to constitute undue influence sufficient to void a will, there must be imprisonment of the body or mind, . . . fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery or physical or moral coercion, to such a degree as to prejudice the mind of the testator, to destroy his free agency and to operate as a present restraint upon him in the making of a will.

A party claiming undue influence must establish, by clear and convincing evidence, that: (1) when the will was executed the testator was of weakened intellect and (2) that a person in a confidential relationship with the testator (3) receives a substantial benefit under the will. Once this *prima facie* case has been established, the burden shifts to the proponent to refute the charge of undue influence [by clear and convincing evidence].

***Kreisher v. Schumacher (In re Estate of Schumacher)***, 133 A.3d 45, 52 (Pa. Super. 2016). Pertinent to this appeal, a party may receive a "substantial benefit" based on the "collateral benefit doctrine," which we discuss in detail below. ***See In re LeVin***, 615 A.2d 38 (Pa. Super. 1992).

Appellant alleges that even though the orphans' court properly found a presumption of undue influence arose concerning the 2015 Will, it erred in finding Poorman was able to rebut the presumption and established an "independent basis" for Decedent's bequest to disinherit his family. ***See*** Appellant's Brief at 18-19.

By way of background, the orphans' court found: (1) Decedent suffered from a weakened intellect because he "suffered [from] noticeable symptoms

- 17 -

of dementia"[8] at the time the 2015 Will was executed; (2) a confidential relationship existed between Decedent and Poorman where Poorman "occupied a superior position over Decedent during [his] final days" and Decedent "granted Poorman a power of attorney[,]" in which "Poorman's subsequent actions clearly illustrate[d] that [he] enjoyed a position of superiority of Decedent and Decedent 'placed primary trust' in Poorman's counsel[;]"[9] and (3) Poorman gained a substantial benefit from the terms of the 2015 Will because "Decedent designated [him] as Trustee to dispose of [the] Estate [as he] deem[ed] appropriate within the parameters of the assets being distributed to charitable organizations and that the donations satisfy the tax code."[10] The court then concluded that despite the evidence of weakened intellect, confidential relationship, and substantial benefit, Poorman successfully demonstrated by clear and convincing evidence the absence of undue influence. *See* Orphans' Ct. Op., 10/25/21, at 16. Specifically, it stated:

> Decedent was estranged from [Appellant, and] returned to Lock Haven and lived by himself. Decedent voiced his desire on a number of occasions to disinherit [Appellant and his other family members]. Decedent was upset and disappointed that his family had abandoned him in his later years. Poorman, Doris Jodun, Poorman's now retired staff member, and Carol Hartman, Decedent's faithful and long time employee, heard Decedent on

---

[8] *See* Orphans' Ct. Op., 10/25/21, at 16.

[9] *See* Orphans' Ct. Op., 10/25/21, at 14-15.

[10] *See* Orphans' Ct. Op., 10/25/21, at 15.

numerous occasions voice his frustration and disappointment with the actions of his family members and voiced his desire that they should inherit nothing from his estate. **The [c]ourt finds the testimony of Poorman, Doris Jodun and Carol Hartman all to be credible on this particular issue.**

Decedent's corroborated statements regarding the disinheritance of his wife and his family members, when coupled with [Appellant's] attempt to divest Decedent from ownership in the Collision Center for a fraction of its value, clearly resulted in Decedent taking appropriate action to cement his testamentary intent to disinherit them. The [c]ourt finds that Decedent's action in making and executing the 2015 Will was independent of any influence, undue or otherwise, exercised by Poorman. The [c]ourt is **more than satisfied that Poorman has demonstrated an independent basis for Decedent's bequest overcoming the presumption of the collateral benefit rule**.

*Id.* at 16-17 (emphases added).

At this juncture, we find it necessary to set forth the law concerning the "collateral benefit rule" in the context of the "substantial benefit" prong. Pennsylvania courts have not specifically defined what amounts to a "substantial benefit" and whether one exists is decided on a case-by-case basis. *In re Estate of Fritts*, 906 A.2d 601, 609 (Pa. Super. 2006).

What the law requires is that a person acting as confidential adviser to a testator, bodily infirm and mentally weak, must act in the utmost good faith, and if he is benefited in a legal sense by the will procured by him, he must assume the burden of showing deliberation, volition and understanding on the part of the maker of the will.

*Adams's Estate*, 69 A. 989, 990 (Pa. 1908). Being named the executor or trustee of an estate is not, by itself, sufficient to conclude that person has received a "substantial benefit." *See In re Estate of LeVin*, 615 A.2d 38, 44 (Pa. Super. 1992).

Even where a party does not receive a direct substantial benefit, they may receive a "collateral benefit." *See In re Estate of LeVin*, 615 A.2d at 42. A collateral benefit is present where the trustee of a trust is the recipient of a benefit that "naturally flow[s] from his 'free and complete powers and discretion' so as to label him a beneficiary under the will, and, thus, bring him within the rule fixing the burden of proof on him to disprove undue influence." *Id.* This Court has stated:

> [When a trustee possesses] "absolute discretion" to terminate the trust and distribute the assets to whomever it selected, provided [they met the conditions set forth by the decedent,] we view such distributive powers as embracing the "bulk" of [an] estate. And, when coupled with the fees paid, the powers reserved to [the trustee] endowed it with "collateral benefits" bringing it within the sphere of a "substantial beneficiary[.]"

*Id.* at 44.

Here, Poorman will not receive a direct benefit from, nor is he a named beneficiary to, the 2015 Will. However, as the orphans' court noted, he will realize a substantial benefit in the form of allocating where the assets of the Estate will be donated. *See* Orphans' Ct. Op., 10/25/21, at 15. This "free and complete power[ ] of discretion" amounts to a collateral benefit, thus satisfying the "substantial benefit" prong. *See In re Estate of LeVin*, 615 A.2d at 42.

Nevertheless, our review of the relevant law does not cease there. Where a party receives a collateral benefit from a will, they may overcome the "undue influence" presumption by asserting that an "independent basis exists

- 20 -

to explain a testator's bequest to a beneficiary[,]" which renders the collateral benefits doctrine inapplicable. *See In re Bosley*, 26 A.3d 1104, 1110 (Pa. Super. 2011) (citation omitted).

Here, as mentioned above, the orphans' court found that "Poorman has demonstrated an independent basis for Decedent's bequest overcoming the presumption of the collateral benefit rule." Orphans' Ct. Op., 10/25/21, at 17

Returning to Appellant's arguments, she contends the court improperly determined Poorman "demonstrated an independent basis for Decedent's bequest overcoming the presumption of the collateral benefit rule" and "expanded the exception to a degree that has never been done in Pennsylvania." Appellant's Brief at 19-20 (citation & quotation marks omitted). Appellant maintains a party may overcome a presumption of undue influence through the "independent **familial relationship** exception" to the collateral benefit rule. *See id.* at 20 (emphasis added). She insists that in Pennsylvania, this exception has only been applied when a familial relationship exists between a testator and beneficiary. *Id.* Appellant further asserts the court "improperly applied" this exception to the present facts because Decedent had no familial relation to Poorman or the charities intended to receive donations.[11] *Id.*

---

[11] Appellant points out that Poorman has "significant relationships" to some of the charities listed as donation recipients. Appellant's Brief at 20. Poorman has, in the past, independently supported some of the charities intended to receive future donations from the Estate. As a result of Poorman's personal
*(Footnote Continued Next Page)*

Further, Appellant highlights that Poorman only presented evidence in the form of his own self-serving testimony, statements from employees of his or Decedent's businesses, and "bald charts and figures about [the Collision Center] that he prepared, without any substantiating documents." Appellant's Brief at 21-22 (emphasis omitted). She further maintains that evidence is not sufficient to rebut the court's conclusion that undue influence was present when Decedent executed the 2015 Will. *Id.* at 24.

We disagree with Appellant's contentions. A review of the record supports the orphans' court's finding that an independent basis existed to explain Decedent's bequest, which rendered the collateral benefits doctrine inapplicable. *See In re Bosley*, 26 A.3d at 1110. As the court detailed extensively, Decedent was estranged from his family and expressed on numerous occasions that he wished to disinherit them. At the April hearing, Appellant denied the deteriorating relationship circumstances Decedent expressed to Poorman and others. *See* N.T. 4/27/21, at 100-01, 106-08. However, based on the court's finding, one can reasonably infer that the court chose not to credit her evidence. Instead, it found credible the testimony of Poorman, Hartman, and Jodun, which included Poorman's testimony that Decedent was upset with his family and wished to disinherit them. *See*

_____

donations, he received "naming rights" from the organizations. N.T. 4/27/21, at 52. However, Poorman explained at the April 27th hearing that he will not receive any intangible benefits related to donations derived from the Estate. *Id.*

Orphans' Ct. Op., 10/25/21, at 16-17. We note that credibility determinations are within the discretion of the trial court, and we do not disturb the court's findings on appeal. *See In re Est. of Byerley*, 284 A.3d at 1236. According to Poorman, Hartman, and Jodun's testimony, Decedent often expressed his disdain for Appellant and his other family members. *See id.* at 16. Further, Poorman's evidence demonstrated that Decedent worked with him for years to fix damage done to his company and other properties done by Appellant's sons. Considering this evidence, the court concluded, and we agree, that there was a sufficient independent basis lending itself to Decedent's independent decision to disinherit his family. *See In re Bosley*, 26 A.3d at 1110. Thus, we discern no error as to the court's allocations of the burdens of proof, including its finding that Poorman overcame his burden of establishing by clear and convincing evidence the absence of undue influence. No relief is due.[12]

_____

[12] It merits mention that Appellant also raised an argument that the orphans' court incorrectly applied the independent basis exception to the collateral benefits doctrine. She insists it may only be applied where there is a familial relationship between the testator and beneficiary. *See* Appellant's Brief at 20-21. This argument is waived. Appellant did not lodge an objection based on this principle, nor did she include this argument in her Rule 1925(b) statement. *See* Pa.R.A.P. 302(a) (issues cannot be raised for the first time on appeal); Pa.R.A.P. 1925(b)(4)(vii) (issues not included in a Rule 1925(b) statement are waived for appellate review).

Moreover, even if Appellant did not waive this argument, no relief would be due. She insists that an "independent basis" overcoming substantial benefit is dependent on a familial relationship. However, while the authority she cites mention familial relationships as a factor, the cases do not state a

*(Footnote Continued Next Page)*

## V.    Conflict of Interest

In her next claim, Appellant argues the orphans' court erred in finding no conflict of interest existed between Poorman and the Estate, and therefore, Poorman should not be removed as executor of the Estate. Appellant's Brief at 26. Appellant avers that Poorman filed a notice of claim against the Estate, obtained judgment by confession against the Estate, and also is named as a defendant in a civil suit where the Estate is the plaintiff. *Id.* Appellant maintains that Poorman should be removed as executor based on this litigation. *Id.* at 27-30. Appellant insists that Poorman's personal interests "are undeniably in conflict with that of the [E]state" and thus, he should be removed as personal representative. *Id.* at 28.

The grounds for removal of a personal representative are set forth in 20 Pa.C.S. § 3182. That statute permits the trial court to replace a personal representative when he or she "is wasting or mismanaging the estate, is or is

---

familial relationship is necessary. *See In re Bosley*, 26 A.3d at 1110 (determining no substantial benefit existed where the testator made specific requests and afforded the executor "little or no latitude" in the distribution of assets; concluding that "[a]dditionally" a familial relationship qualified as an independent basis to overcome collateral benefits); *In re Estate of Stout*, 746 A.2d 645, 649 (Pa. Super. 2000) (concluding the power granted to an executor was not a substantial benefit where testator was specific in their requests and gave executor only "some discretionary power[;]" stating that in addition it recognized that a "blood relationship" affords a sufficient basis for a bequest); *In re Estate of Simpson*, 595 A.2d 94, 98-99 (Pa. Super. 1991) (petitioner did not meet all three factors to show a presumption of undue influence; acknowledging that a familial relationship is enough to overcome the substantial benefit factor of the three part test, but does not require it).

likely to become insolvent, or has failed to perform any duty imposed by law," as well as "when, for any other reason, the interests of the estate are likely to be jeopardized by his continuance in office." 20 Pa.C.S. § 3182(1), (5).

Here, Appellant has alleged a conflict of interest exists between Poorman and the Estate. A conflict of interest is sufficient to remove a personal representative to an estate

> when the fiduciary's personal interest is in conflict with that of the estate, such that the two interests cannot be served simultaneously. The reasons for removal of a fiduciary must be clearly proven. However, proof of a conflict of interest can be inferred from the circumstances. **See In re Estate of Gadiparthi**, 632 A.2d 942, 946 (Pa. Commw. 1993) (ordering removal of an administrator, based on conflict of interest, after he challenged decedent's ownership of property titled in decedent's name). When a conflict of interest is apparent from the circumstances, bad faith or fraudulent intent on the part of the fiduciary need not be proven.

**In re Estate of Westin**, 874 A.2d 139, 143 (Pa. Super. 2005) (some citations omitted).

In the case *sub judice*, the orphans' court determined that Poorman's decision to file a claim against the Estate is not "dispositive" to a conflict of interest finding. Orphans' Ct. Op., 10/25/21, at 17, *citing* **In re Purman's Estate**, 5 A.2d 906, 908-09 (Pa. 1939) (removing executor of a will was not necessary because there was no reason to suspect that the interests of the estate were jeopardized by the claim the executor filed against it and the claim was dismissed). Further, the court found:

> . . . Poorman has acted in the best interest of Decedent and the Estate for approximately seven years. It is likely the Estate would

be without assets if Poorman had not stepped up to the plate. Poorman testified that he will not make a claim for the Trustee's fees and will continue to competently manage the Estate assets until they are liquidated and distributed in accordance with the 2015 Will.

Orphans' Ct. Op., 10/25/21, at 17. The court stated that the filing of a claim against the Estate is not dispositive to a decision to remove a personal representative and focused on the fact that Poorman acted in the best interest of Decedent before his passing. *Id.* We disagree with the court's finding.

Despite Poorman's intentions, we conclude a conflict of interest does exist. We point out that Poorman is involved in a civil action where he is effectively named as both parties, which raises substantial concerns. *See* Appellant's Exhibits 15 and 16. Poorman is in a position where he must act in the best interest as the personal representative of the Estate, but also must act in his own best interests as an opposing party. As such, Poorman's personal interest is in conflict with that of the Estate, "such that the two interests cannot be served simultaneously."[13] *In re Estate of Westin*, 874 A.2d at 143. A conflict of interest is "readily apparent from these

---

[13] *See also In re Estate of Andrews*, 92 A.3d 1226, 1232 (Pa. Super. 2014) (executrix had conflict of interest when she received loans from the estate that she contended she did not have to repay); *Estate of Westin*, 874 A.2d at 143 (executor had actual conflict of interest when an employee at his law firm embezzled funds from the estate).

Moreover, we note that, generally, a personal representative chosen by the testator cannot be removed "in the absence of a showing of injury by reason thereof to the best interests of the estate. *See DiMarco Estate*, 257 A.2d 849, 854 (Pa. 1969). Here, it is clear the best interests would not be served by a personal representative who is currently suing the Estate.

circumstances[,]" and thus, we conclude Poorman should be removed as executor and a new personal representative should be appointed. *Id.* Accordingly, we reverse the court's October 25, 2021, order as to this determination and remand for further proceedings.

## VI.   Admission of Exhibits 1 through 3

In Appellant's next claim, she alleges the trial court erred in admitting Exhibits 1, 2, and 3 over objection. *See* Appellant's Brief at 31. By way of background, at the April hearing, Poorman offered the following exhibits into evidence: (1) Exhibit 1 — a June 18, 2015, letter from Poorman to Attorney Rosamilia expressing Decedent's wish to not include his family in his will; (2) Exhibit 2 — a June 27, 2015, written statement from Decedent expressing that he did not want to include family members in his will; and (3) Exhibit 3 — a October 8, 2015, written statement from witness Doris Jodun, signed by Poorman and Decedent, stating that Decedent did not wish for any of his family members to receive "a God-damned thing" from his estate. *See* N.T., 4/27/21, at 18, 21-22, 40; Estate's Exhibits 1-3. Appellant objected to the introduction of these exhibits on the basis of hearsay and authentication. Appellant's Brief at 31.

Appellant maintains that Exhibit 1 is an out-of-court statement from Poorman expressing Decedent's alleged wishes pertaining to his will and as such amounts to double hearsay. Appellant's Brief at 32. Next, Appellant contends Exhibit 2 is "inadmissible, unauthenticated hearsay." *Id.* She insists that Poorman did not establish why the document was prepared. *Id.* at 33.

- 27 -

She also points out the unidentified witness,[14] who was purportedly present at the time the statement was made, was not present at the hearing. *Id.* Lastly, Appellant alleges Exhibit 3 is an out-of-court, self-serving statement from Poorman and Jodun and also amounts to double hearsay. *Id.* at 34. Appellant argues that there is no exception to the rule against hearsay allowing for the admission of these exhibits. *Id.* at 32-34.

We review a challenge to the admissibility of evidence pursuant to the following standard:

> [I]t is well settled that the admissibility of evidence is a determination left to the sound discretion of the trial court, and it will not be overturned absent an abuse of discretion or misapplication of law. For a ruling on the admissibility of evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.

*In re Fiedler*, 132 A.3d 1010, 1025 (Pa. Super. 2016) (quotation marks & citations omitted).

Hearsay is a statement "the declarant does not make while testifying at the current trial or hearing; and . . . a party offers in evidence to prove the truth of the matter asserted[.]" Pa.R.E. 801(c). Generally, hearsay evidence is not admissible. Pa.R.E. 802. However, hearsay may be admitted when it meets an exception outlined in the Pennsylvania Rules of Evidence. Relevant

---

[14] This witness was allegedly a former employee of Poorman's. *See* N.T. 4/27/21, at 48.

to the challenged documents, Rule 803 permits the following exceptions to the rule against hearsay:

> (3) Then-Existing Mental, Emotional, or Physical Condition.  A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.
>
> \*   \*   \*
>
> (6) Records of a Regularly Conducted Activity. A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if,
>
>> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>>
>> (B) the record was kept in the course of a regularly conducted activity of a "business," which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;
>>
>> (C) making the record was a regular practice of that activity;
>>
>> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>>
>> (E) neither the source of information nor other circumstances indicate a lack of trustworthiness.

Pa.R.E. 803(3), (6).

Further, this Court has stated:

> Traditionally, statements of the declarant's then existing state of mind are considered reliable based on their spontaneity. There are ordinarily three instances in which the state of mind exception is applicable.  First, the exception may apply to prove

- 29 -

the declarant's state of mind when that state of mind is an issue directly related to a claim or defense in the case. Second, the exception can apply to demonstrate that a declarant did a particular act that was in conformity with his or her statement after having made the statement. Finally, an out of court statement related to the person's memory or belief is admissible in the limited instance where it relates to the "execution, revocation, identification or terms of the declarant's will."

*In re Estate of Maddi*, 167 A.3 818, 827-28 (Pa. Super. 2017) (citations omitted).

We conclude the orphans' court did not abuse its discretion when it admitted Exhibits 1 through 3 under an exception to the hearsay rule. Regarding each of the exhibits, they contained statements expressing Decedent's then-existing state of mind and intent to disinherit his family in his will. *See* Pa.R.E. 803(3); *Maddi*, 167 A.3d at 827-28. Further, Poorman stated he regularly documented this type of information as a regular business practice. *See* Pa.R.E. 803(6); N.T. 4/27/21, at 21-22, 24. Thus, these documents fall under the above-provided hearsay exceptions. Accordingly, Appellant failed to demonstrate the court abused its discretion in admitting the evidence. *In re Fiedler*, 132 A.3d at 1025. No relief is due.

## VII.  Admission of Exhibits 4 through 6, and 10

In Appellant's next argument, she challenges the admission of Exhibits 4 through 6, and 10. She alleges Exhibits 4 through 6 are "demonstrative evidence" and "must be authenticated by evidence sufficient to support a finding that [it] fairly and accurately represents that which it purports to depict." Appellant's Brief at 34. Appellant insists Poorman failed to produce

sufficient evidence to authenticate these documents. *Id.* at 35. Regarding Exhibit 10, Appellant simply argues it "is plainly inadmissible hearsay." *Id.*

To authenticate a document, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is. Pa.R.E. 901(a). "Demonstrative evidence may be authenticated by testimony from a witness who has knowledge 'that a matter is what it is claimed to be.'" *Commonwealth v. Serge*, 896 A.2d 1170, 1177 (Pa. 2006), *citing* Pa.R.E. 901(b)(1) (evidence may be authenticated by testimony that an item is what it is claimed to be). Further,

> [i]t is well-settled that "[e]videntiary rulings are committed to the sound discretion of the trial court, and will not be overruled absent an abuse of discretion or error of law." Importantly, if a party presents evidence about a certain issue, then they open the door to rebuttal evidence that may not otherwise have been admissible.

*Tillery v. Children's Hosp. of Phila.*, 156 A.3d 1233, 1243 (Pa. Super. 2017).

In the present matter, the orphans' court admitted Exhibits 4 through 6 — charts compiled by Poorman which depicted performance trends, cash positions, and turnaround effectiveness of the Collision Center after he became involved in the company — and Exhibit 10 — a signed statement purportedly showing evidence of a fraudulent transaction on the part of Appellant's sons, Stephen and Logan Pendola. *See* N.T., 4/27/21, at 55, 58-59, 65, 113; Estate's Exhibits 4-6, 10. The court explained its reasoning as follows:

> Appellant's [E]xhibits 4, 5, 6, and 10 were admitted after receiving the affidavit of . . . Poorman attesting to the accuracy of the financial data contained in the company records of Collision Industries, Inc., as reported by . . . Hartman, Corporation Bookkeeper. The [c]ourt endorsed this procedure due to the necessity of receiving . . . Poorman's testimony by video due to the Covid-19 crisis. . . . Poorman was isolated in Florida and unavailable to testify in person at the time of the hearing.
>
> The [c]ourt is satisfied that [E]xhibits 4, 5, 6, and 10 were properly authenticated upon receipt of . . . Poorman's affidavit and found the exhibits to be authentic and admissible.

Orphans' Ct. Op., 1/10/22, at 3. We conclude the court did not abuse its discretion.

Regarding Exhibits 4 through 6 — charts pertaining to the Collision Center's financial information — Appellant's counsel asked Poorman during the April hearing if he had "any written documentation to support [the business's] turnaround[.]" N.T. 4/27/21, at 45. Poorman then offered graphs with that relevant information into evidence. *Id.* at 59. Because Poorman testified at the April hearing *via* video link,[15] Appellant objected to the authenticity of these documents. *See id.* at 54-55. At the direction of the court, Poorman submitted an affidavit authenticating each of these exhibits. *See* Affidavit of Stephen P. Poorman Regarding Proposed Exhibits from Hearing on April 27, 2021, 6/1/21. Though Appellant is not personally satisfied with Poorman's affidavit, the affidavit satisfies the rules of evidence based on the specific circumstances of this case, and as such, the orphans' court was within its discretion to accept the documents as authenticated. *In*

---

[15] Poorman testified by video due to Covid-19 concerns.

*re Fiedler*, 132 A.3d at 1025. Moreover, Appellant waived any objection to the introduction of this evidence when she asked Poorman at the April hearing if he had evidence supporting his testimony. *See Tillery*, 156 A.3d at 1243. Thus, we discern the court did not abuse its discretion in admitting Exhibits 4 through 6.

As for Exhibit 10, Appellant simply argues it is "plainly inadmissible hearsay." Appellant's Brief at 35. We conclude no relief is due. Appellant questioned Poorman at the April hearing as follows:

> [Appellant]: [Poorman] had a lot of allegations about . . . misconduct on the part of [Appellant] and her sons; is that correct?
>
> [Poorman]: I believe in the case of her sons, I refer to it as fraud.
>
> [Appellant]: Sitting here today, do you have paperwork, any evidence, whatsoever, to support your testimony?
>
> [Poorman]: I have evidence to support fraud.
>
> [Appellant]: Sitting here right now, do you have evidence to show to the [c]ourt to support anything you've testified about?

N.T. 4/27/21, at 43-44. Later in the hearing when Appellant objected to Exhibit 10's admission, the court pointed out to Appellant that she "open[ed] the door [to the admissibility of this evidence] when [she] raised [her] question" regarding proof of fraud. *Id.* at 58. For this reason, we conclude no relief is due. *See Tillery*, 156 A.3d at 1243; *In re Fiedler*, 132 A.3d at 1025.

## VIII. Appointment of GAL

Lastly, Appellant argues the orphans' court erred when it appointed a GAL *sua sponte*, without issuing a proper order, and directed her to pay the costs. **See** Appellant's Brief at 35. Appellant maintains that a GAL cannot be appointed to a deceased person and "terminates upon the death of the incapacitated" person. **Id.** at 37. However, Appellant contends the court *sua sponte* appointed a GAL "several months after" she filed her initial appeal from the Register of Wills. **Id.** Appellant insists that she "question[ed] the appointment and costs but was rebuffed because the court found the [GAL] helpful." **Id.** This claim is waived.

The orphans' court, Poorman, and the GAL all agree that Appellant did not raise any objection to the appointment of the GAL and the associated costs in a timely manner. **See** Orphans' Ct. Op., 1/10/22, at 4 (unpaginated); Appellee's Brief at 22; GAL's Brief at 42-43, 43 n.11. Indeed, upon our own review, the record does not reveal any objection lodged by Appellant regarding this claim. Moreover, she does not cite to any objection in her brief to indicate that she preserved the claim. As such, this claim is waived. **See** Pa.R.A.P. 302(a) (issues cannot be raised for the first time on appeal). No relief is due.

### IX. Conclusion

We conclude the orphans' court did not err or abuse its discretion in: (1) finding Poorman satisfied his burden to show the absence of undue influence; (2) admitting Exhibits 1 through 6, and 10 over objection; and (3) finding Appellant waived any claim regarding the appointment of a GAL. We also conclude the orphans' court did err in finding no conflict of interest existed

between Poorman and the Estate. On this issue only, we remand the matter to the orphans' court for removal of Poorman as personal representative to the Estate.

Order affirmed in part and reversed in part. Case remanded for removal of personal representative and for the court to appoint a new executor. Jurisdiction relinquished.

President Judge Emeritus Stevens joins the memorandum.

Judge Bowes files a concurring memorandum.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 07/18/2023